922 A.2d 693

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER ROMERO, DEFENDANT–
APPELLANT.

Argued October 31, 2006—Decided May 21, 2007.

*Richard W. Berg* argued the cause for appellant (*Robin Kay Lord,* attorney; *Mr. Berg* and *Ms. Lord,* of counsel and on the briefs).

*Hillary K. Horton,* Deputy Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General of New Jersey, attorney).

*Raquel Y. Bristol,* Assistant Deputy Public Defender, argued the cause for amicus curiae Office of the Public Defender (*Yvonne Smith Segars,* Public Defender, attorney).

*Gina Mendola Longarzo* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Hack, Piro, O'Day, Merklinger, Wallace & McKenna and Connell & Foley,* attorneys; *Ms. Longarzo* and *Patricia A. Lee,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

Defendant, Christopher Romero, was convicted of first-degree robbery and related offenses in connection with the mugging of Carmine Cavaliere. Identification was the pivotal issue in the case. Defendant, who is Hispanic, claimed that the victim, a Caucasian, misidentified him. Because of the importance of the identification testimony and the dearth of corroborating evidence to supplement the reliability of that identification, defendant asked the trial court to instruct the jury with a cross-racial identification charge tailored to address this "cross-ethnic" identification. *See State v. Cromedy,* 158 *N.J.* 112, 727 *A.*2d 457 (1999) (establishing when jury must receive instruction warning about potential short-

comings of cross-racial identification testimony). The court provided the jury with an instruction on identification testimony generally, but no special *Cromedy* charge was given.

In this appeal, we are asked whether it was reversible error for the court not to have given a *Cromedy* charge in this setting. We conclude that the jury received ample instruction about the need to examine carefully the identification made by Cavaliere, and, thus, defendant was not denied a fair trial without a tailored *Cromedy* charge. Social science research does not tie identification unreliability directly to ethnic differences in the same way that racial differences can affect identification reliability. That said, identification testimony is an area that warrants vigilant supervision. An eyewitness's identification carries significant impact in criminal cases. This appeal highlights the importance of the model charge that guides jurors in the assessment of the reliability of that powerful evidence. We use this opportunity to refine the charge so that it will alert jurors in all eyewitness identification cases that such testimony requires close scrutiny.

I.

At about 9 p.m. on October 29, 2001, Cavaliere was attacked from behind by two men while walking home from a convenience store in Trenton. One attacker retreated quickly, but the other remained and wrestled with Cavaliere for several minutes, during which Cavaliere was stabbed. Cavaliere's trial testimony detailing the attack revealed the extent to which he could observe his attacker.

The night of the attack, Cavaliere first noticed defendant and another person while shopping in a neighborhood convenience store. At the time, he gave no thought to it—seeing the men in the store meant nothing to him. While walking home, however, he was "jumped" from behind. The first attacker stabbed Cavaliere and placed him in a headlock. That person was later identified as defendant. The second punched Cavaliere in the face and ran away. The first attacker remained and continued to wrestle with

Cavaliere. When Cavaliere managed to place his attacker in a headlock, the attacker began "chopping away at [Cavaliere's] hand" with a knife, cutting four tendons. The attacker then escaped Cavaliere's hold, got on top of him, and attempted to stab Cavaliere in the eye and throat. Fortunately, a light came on in the house next to where the men were struggling, and Cavaliere's attacker fled.

Cavaliere described the attack as lasting anywhere from three to five minutes, during which his attacker was about six to eight inches away. There were a "couple of street lights on that part of the street." He stated that during at least a minute and a half of the attack he was able to see his attacker's face and that, the moment the outside light came on from the house one door down, he was "able to get a good look at [his attacker] because [they] were face-to-face with each other." After the attacker fled, two people came out of the illuminated house and called for emergency assistance. Those people were identified later as defendant's parents.

The night of the mugging, Cavaliere told investigating police that the man who attacked him with the knife was "Spanish," aged twenty to twenty-five, and had something wrapped around his head. Four days later, after he was released from the hospital and had returned home, Cavaliere elaborated on that description to the police, adding that the man had dark hair and dark skin.

Three days later, while driving down his street, Cavaliere saw defendant walking past Cavaliere's home at about noon. Cavaliere testified that he stopped the car, took a good look at defendant's face, then entered his home and immediately telephoned the police to report that he had just seen the man who had attacked and stabbed him. When the responding officers arrived, Cavaliere described the clothing being worn by his alleged attacker that day: a brown cap,[1] a short-sleeved shirt and a pair of jeans. The

---

[1] Cavaliere told the officers that his assailant was wearing a brown "turtle cap," which is similar to "a doorag, which is a ... tight fitting ... head rag with

officers and Cavaliere then canvassed the neighborhood in a police vehicle looking for the man Cavaliere had described.

Unable to locate the person, the officers brought Cavaliere home. Fifteen or twenty minutes later, the officers returned to Cavaliere's home and told him that in the back of their police vehicle they had someone who fit the description given earlier by Cavaliere. Cavaliere approached the car and looked at the man in the backseat for "about a minute, minute and a half." Cavaliere testified that he recognized defendant "right away" as the person who had attacked him, but that he took his time before identifying defendant because he wanted to be "100 percent sure." At the time of the identification, the police officers asked Cavaliere whether he "was sure" that defendant was the man who had stabbed him and Cavaliere responded affirmatively. At police headquarters, Cavaliere reasserted that defendant was his attacker.

Defendant was indicted and charged with first-degree robbery, *N.J.S.A.* 2C:15–1 and 2C:2–6 (Count One); third-degree attempted theft, *N.J.S.A.* 2C:20–3(a), 2C:2–1, and 2C:2–6 (Count Two); third-degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(7) and 2C:2–6 (Count Three); third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(d) and 2C:2–6 (Count Four); and fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(d) and 2C:2–6 (Count Five).

Defendant requested a *Cromedy* cross-racial identification charge. That model charge instructs the jury to consider

[t]he fact that an identifying witness is not of the same race as the perpetrator and/or defendant, and whether that fact might have had an impact on the accuracy of the witness's original perception, and/or the accuracy of the subsequent identification. You should consider that in ordinary human experience, people may have greater difficulty in accurately identifying members of a different race.

[*Model Jury Charge (Criminal)*, Identification: Out–of–Court Identification (2007).]

---

strings." Cavaliere added that, instead of strings, a turtle cap has an elastic band.

Because the witness-victim is a non-Hispanic Caucasian male and the defendant is a Hispanic male, the trial court held a mini-charge conference prior to trial to hear defendant's request. After considering the arguments of counsel, the court refused to give the *Cromedy* charge. The court determined that, although Hispanic by ethnicity, defendant is Caucasian from the perspective of racial classifications and, therefore, a cross-racial jury charge was inapplicable.

In lieu of a *Cromedy* charge, the court instructed the jury, consistent with the model charge on out-of-court identifications, to consider the following when determining whether the identification testimony it heard was sufficiently reliable:

> The witness's opportunity to view the person who committed the offense at the time of the offense[;] ... the witness's degree of attention on the perpetrator when the crime was being committed; the accuracy of any description the witness gave prior to the identification of the perpetrator; the degree of certainty explained—expressed by the witness in making the identification; the length of time between the witness's observation of the offense and the first identification; discrepancies or inconsistencies, if any, between identifications; the circumstances under which any out-of-court identification was made; and any other factor based upon the evidence or lack of evidence in this case which you consider relevant to your determination whether the identifications were reliable.

The jury convicted defendant on all counts. In sentencing defendant, the court merged Count Two into Count One and Count Five into Count Four. On the first-degree robbery charge (Count One), the court imposed a sentence of fifteen years of incarceration, with a mandatory eighty-five percent parole ineligibility period pursuant to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2. In respect of Counts Three and Four, the court sentenced defendant on each to five years of imprisonment, with a two-and-one-half-year period of parole ineligibility, to be served concurrently with the sentence imposed for Count One. Pursuant to a plea agreement on a separate indictment, defendant pled guilty to third-degree unlawful possession of a weapon and the court sentenced him to a term of three years imprisonment to be served consecutively to the aforementioned sentences.

On appeal, the Appellate Division, in an unpublished opinion, rejected defendant's argument that the failure to give a *Cromedy* charge deprived him of a fair trial. The panel also rejected defendant's argument that the showup identification was impermissibly suggestive. We granted defendant's petition for certification, 186 *N.J.* 604, 897 *A.*2d 1058 (2006), and now affirm defendant's convictions.

## II.

### A.

In *Cromedy, supra,* this Court approved the use of a cross-racial jury instruction when "identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." 158 *N.J.* at 132, 727 *A.*2d 457. Writing for the Court, Justice Coleman declared that "the purpose of a cross-racial instruction is to alert the jury through a cautionary instruction that it should pay close attention to a possible influence of race." *Id.* at 133, 727 *A.*2d 457 (noting also that instruction would be sufficient aid to jury "[b]ecause of the 'widely held commonsense view that members of one race have greater difficulty in accurately identifying members of a different race'" (quoting *United States v. Telfaire,* 469 *F.*2d 552, 559 (D.C.Cir.1972) (Bazelon, C.J., concurring))).

In that decision, we considered several studies that "concluded that eyewitnesses are superior at identifying persons of their own race and have difficulty identifying members of another race." *Id.* at 121, 727 *A.*2d 457 (citing Gary L. Wells & Elizabeth F. Loftus, *Eyewitness Testimony: Psychological Perspectives* 1 (1984); Elizabeth F. Loftus, *Eyewitness Testimony* (1979); Sheri Lynn Johnson, *Cross–Racial Identification Errors in Criminal Cases,* 69 *Cornell L.Rev.* 934 (1984); Stephanie J. Platz & Harmon M. Hosch, *Cross–Racial/Ethnic Eyewitness Identification: A Field Study,* 18 *J. Applied Soc. Psychol.* 972 (1988)). That impairment is known as the "own-race" effect or "own-race" bias, and in

*Cromedy*, we acknowledged that "eyewitnesses experience a 'cross-racial impairment' when identifying members of another race." *Ibid.* Further, we noted that social science studies revealed that the "cross-racial impairment" is " 'strongest when white witnesses attempt to recognize black subjects.' " *Ibid.* (quoting *People v. McDonald*, 37 *Cal.*3d 351, 208 *Cal.Rptr.* 236, 690 *P.*2d 709, 720 (1984)).[2]

As its discussion of the social science research underscored, *Cromedy* focused plainly on the impact of race on eyewitness identifications. Ethnicity, or ethnic differences however defined, was not the subject of *Cromedy's* Brandeis-like compilation of studies of racial impact on identification. Yet, defendant argues that *Cromedy's* mandate should apply in the present setting, one he describes as involving a non-Hispanic Caucasian eyewitness and a Hispanic Caucasian defendant. Those identifying terms used by defendant would require an expansion of the *Cromedy* instruction to circumstances involving "ethnic" differences. Ethnicity generally, and "Hispanic ethnicity" specifically, is accepted as different from race.

The federal government distinguishes between race and Hispanic ethnicity. In collecting census data, "[t]he federal government considers race and Hispanic origin to be two separate and distinct concepts," in recognition that "Hispanics may be of any race." United States Census Bureau, *Overview of Race and Hispanic Origin: Census 2000 Brief* 1–2. Moreover, the term "Hispanic," although susceptible to interpretation, is not synonymous with race. "The term 'Hispanic' or 'Latino' describes a population with a common cultural heritage and most often a common language, but it does not refer to race or a common ancestry." Esteban

---

[2] The extensive research had its limitations, however, as we noted that a "snap-shot of the literature reveals that although many scientists agree that witnesses are better at identifying suspects of their own race, they cannot agree on the extent to which cross-racial impairment affects identification." *Cromedy, supra,* 158 *N.J.* at 122, 727 *A.*2d 457 (citing *McDonald, supra,* 208 *Cal.Rptr.* 236, 690 *P.*2d at 720; *United States v. Nguyen,* 793 *F.Supp.* 497, 513–14 (D.N.J.1992)).

Gonzalez Burchard et al., *Latino Populations: A Unique Opportunity for the Study of Race, Genetics, and Social Environment in Epidemiological Research,* 95 *Am. J. of Pub. Health* 2161, 2161 (2005).

To date, only two Appellate Division panels have considered *Cromedy* in connection with alleged cross-ethnic identifications involving Hispanics and non-Hispanics. In *State v. Valentine,* the Appellate Division upheld a conviction, notwithstanding the lack of a *Cromedy* charge, because the court concluded that the contested identification did not involve persons of different race. 345 *N.J.Super.* 490, 496–97, 785 *A.*2d 940 (App.Div.2001) (addressing identification of non-Hispanic African–American male by Hispanic African–American witness), *certif. denied,* 171 *N.J.* 338, 793 *A.*2d 716 (2002). More recently, however, the Appellate Division reversed a conviction due to the trial court's denial of a *Cromedy* charge in *State v. Walton,* 368 *N.J.Super.* 298, 305, 845 *A.*2d 1257 (App.Div.2004). The panel concluded that the identifying non-African-American Hispanic witness and non-Hispanic African–American defendant were of different races and that, in that setting, the trial court erred when it denied the requested *Cromedy* charge. *Id.* at 303–06, 845 *A.*2d 1257.

### B.

■ The charge fashioned in *Cromedy* clearly was directed at cross-racial identification settings because of the convincing social science data demonstrating the potential unreliability of cross-racial identifications of African–American defendants specifically. Cross-ethnicity, on the other hand, has been described as difficult to define and apply with precision in an identification setting. *See People v. Wright,* 45 *Cal.*3d 1126, 248 *Cal.Rptr.* 600, 755 *P.*2d 1049, 1072 n. 4 (1988) (commenting that "the vogue word 'ethnic' is so broad—referring variously to racial, cultural, geographic, linguistic, religious, national, or other groupings, or any combination thereof—that it defies both controlled scientific study and consis-

tent juror application: what may be a 'cross-ethnic' identification to one juror may not be to another").[3]

Although there exists identification research involving participants of different ethnicity, few studies have explored the ability of non-Hispanics reliably to identify Hispanics. In 1988, one study did include Hispanics and all participants were tested for cross-race/ethnic effect on identifications. *See* Stephanie J. Platz & Harmon M. Hosch, *Cross–Racial/Ethnic Eyewitness Identification: A Field Study*, 18 *J. Applied Soc. Psychol.* 972, 972 (1988). Platz and Hosch examined the performance of Mexican–American, black, and non-Hispanic white convenience store clerks in identifying customers with whom they had interacted earlier in the day. *Id.* at 975–77. The study concluded that the clerks were better able to recognize individuals of their own race or ethnicity. *Id.* at 978–79.[4] Other researchers, however, have since questioned

---

[3] In *Wright, supra,* the court was criticizing the inclusion of a reference to the "cross-ethnic" nature of an identification in a jury instruction on out-of-court identifications prepared by the drafters of the California Jury Instructions, Criminal (CALJIC), calling the reference "an invention of the CALJIC drafters" that was unfounded in California's decisional law and social science research. 248 *Cal.Rptr.* 600, 755 *P.2d* at 1072 n. 4. The *Wright* Court declared that a cross-ethnic factor had "no place" in the model criminal jury instruction to be used in the courts. *Ibid.* The California Rules of Court subsequently were amended to rescind approval of all CALJIC charges. *See Cal. Rules of Court,* rule 855 (2006) (reorganized and renumbered as *Cal. Rules of Court,* rule 2.1050). The only official and "approved jury instructions" for the California criminal courts are those now drafted by the Judicial Council of California (CALCRIM). *Cal. Rules of Court,* rule 2.1055; *see also Cal. Rules of Court,* rule 2.1050. *CALCRIM No.* 315 instructs juries to consider only whether "the witness and the defendant [are] of different races." Thus, our research reveals no jurisdiction that includes a cross-ethnic factor to be considered by juries when assessing the reliability of an out-of-court identification.

[4] The study involved a Mexican–American, black, or white customer entering the store and asking for directions and/or making an involved purchase from the clerk. Platz & Hosch, *supra,* 18 *J. Applied Soc. Psychol.* at 975. Two hours after the interaction, the clerks were shown a series of lineup photographs and were asked to identify the individuals who were in the store earlier that day. *Id.* at 975–76. Notably, the study concluded that non-Hispanic white clerks correctly identified non-Hispanic white customers 53.2 percent of the time, whereas black

whether Platz and Hosch's study involved an adequate number of participants to be statistically significant. *See* Siegfried L. Sporer, *The Cross–Race Effect: Beyond Recognition of Faces in the Laboratory,* 7 *Psychol. Pub. Pol'y. & L.* 170, 177 (2001). Two other studies, conducted after Platz and Hosch's research, also involved Hispanic participants; however, those studies are less helpful because they did not test for the reliability of identifications of Hispanics by non-Hispanics.[5]

In the aggregate, those three studies do not provide substantial support for defendant's claim that a *Cromedy* jury instruction must be administered when a cross-ethnic identification is involved. The most that can be said is that research in the area has begun. At present, there is insufficient data to support the conclusion that, as a matter of due process, people of the same race but different ethnicity, specifically Hispanic ethnicity, require

customers were identified correctly 40.4 percent of the time and Mexican–American customers 34.0 percent of the time. *Id.* at 978. The Mexican–American clerks identified Mexican–American customers correctly 53.6 percent of the time, whereas the Mexican–American clerks identified black customers correctly 25.0 percent of the time and non-Hispanic white customers 35.7 percent of the time. *Ibid.* Further, the black clerks identified black customers correctly 63.6 percent of the time, whereas the black clerks identified non-Hispanic white customers correctly 54.6 percent of the time and Mexican–American customers 45.4 percent of the time. *Ibid.*

[5] One study, conducted by the Eyewitness Research Laboratory University of Texas, El Paso, tested for cross-race effect with Hispanic participants and concluded that Hispanic participants recognized facial images of Hispanics better than the images of black persons. Vivian Herrera et al., *Examining the Cross–Race Effect Using Racially Ambiguous Faces,* Presentation to the Western Psychological Association Annual Meeting, 4 (Apr.2000), http://eyewitness.utep.edu/Documents/HerreraWPA2000.pdf. Another study concluded that Latino participants did not identify portraits of black persons faces as well as did black participants, but added that the Latino participants did identify white faces as well as the white participants. Stephanie Teitelbaum & R. Edward Geiselman, *Observer Mood and Cross–Racial Recognition of Faces,* 28 *J. of Cross–Cultural Psychol.* 93, 100 (1997). Again, however, the study did not test whether the white or black participants could identify reliably portraits of Hispanic faces. *Id.* at 96.

a *Cromedy* instruction whenever they are identified by someone of a different ethnicity.

The most recent version of our model jury charge on out-of-court identifications instructs jurors, in relevant part, to consider the following factors when assessing such testimony:

(1) The witness's opportunity to view the person who committed the offense at the time of the offense.

(2) The witness's degree of attention to the perpetrator at the time of the offense.

(3) The accuracy of any description the witness gave prior to identifying the perpetrator.

(4) The degree of certainty expressed by the witness in making the identification.

(5) The length of time between the witness's observation of the perpetrator during the offense and the identification.

(6) The circumstances under which the identification was made, including whether or not it was the product of a suggestive procedure. . . .

(7) Any other factor based on the evidence or lack of evidence in the case which you consider relevant to your determination whether the out-of-court identification was reliable.

[*Model Jury Charge (Criminal)*, Identification: Out–of–Court Identification (2007).]

That basic instruction does not single out certain identifications as uniquely difficult. In the instance of cross-racial identifications where a demonstrated link to reliability exists, we require the supplementary *Cromedy* instruction to address that circumstance.

In this matter we have concluded that social science research does not support similarly tying the reliability of "cross-ethnic" identifications directly to a "cross-ethnic" factor. We hold, therefore, that the trial court did not abuse its discretion in denying defendant's request for a *Cromedy* cross-racial identification charge, tailored to ethnicity. The model charge, as given, focused the jurors' attention on the need to evaluate carefully the reliability of Cavaliere's identification. No error was visited on defendant due to the court's delivery of the model charge.

That said, the exercise of considering the implications of cross-ethnic identifications has caused us to pause over the impact of eyewitness testimony generally. Research suggests that people generally are better able to identify persons who resemble them-

selves or who share familiar physical characteristics. *See* June Chance et al., *Differential Experience and Recognition Memory for Faces,* 97 *J. of Soc. Psychol.* 243, 252 (1975) (concluding that study's subjects "apparently were better able to discriminate and later to recognize individual faces belonging to familiar groups of faces than those belonging to less familiar groups"). Recognition of difficulties associated with the identification of strangers is not new.

Eighty years ago, Justice Frankfurter called "[t]he identification of strangers ... proverbially untrustworthy." Felix Frankfurter, *The Case of Sacco and Vanzetti* 30 (1927). Justice Brennan later observed that "the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined." *United States v. Wade,* 388 *U.S.* 218, 229, 87 *S.Ct.* 1926, 1933, 18 *L.Ed.*2d 1149, 1158 (1967). Indeed, academics have long questioned the reliability of eyewitness identifications. *See* Hugo Munsterberg, *On the Witness Stand: Essays on Psychology and Crime* 49–56 (1923) (discussing early twentieth century experiments that revealed people's inability to recall details of witnessed crimes); Edwin Borchard, *Convicting the Innocent: Errors of Criminal Justice* xiii-xiv (1932) (early case study of sixty-five exonerated defendants finding that "the major source" of wrongful conviction was witness misidentification); *see also* Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* 26–30 (3d ed.1997) (finding that stress may prevent optimum cognitive functioning in relation to identification); Gary L. Wells & Eric P. Seelau, *Eyewitness Identification: Psychological Research and Legal Policy on Lineups,* 1 *Psychol. Pub. Pol'y & L.* 765, 774–75 (1995) (finding that eyewitness's confidence can be induced by external sources); *see generally* Lawrence Taylor, *Eyewitness Identification* 2 (1982) (noting that eyewitness identification evidence is "taken by the average juror as absolute proof" even though "[t]he unreliability of such evidence is now widely accepted among lawyers and psychologists"). Some have pronounced that

mistaken identifications "present what is conceivably the greatest single threat to the achievement of our ideal that no innocent man shall be punished." Carl McGowan, *Constitutional Interpretation and Criminal Identification*, 12 *Wm. & Mary L.Rev.* 235, 238 (1970).

It has been estimated that approximately 7,500 of every 1.5 million annual convictions for serious offenses may be based on misidentifications. Brian L. Cutler & Steven D. Penrod, *Mistaken Identification: The Eyewitness, Psychology, and the Law* 7 (1995). The introduction of DNA analysis and the subsequent exoneration of defendants convicted by faulty witness identification have proven the unreliability of some identifications. Jules Epstein, *Tri–State Vagaries: The Varying Responses of Delaware, New Jersey, and Pennsylvania to the Phenomenon of Mistaken Identifications*, 12 *Widener L.Rev.* 327, 328 (2006). The Innocence Project at the Benjamin N. Cardozo School of Law reported that more than seventy-five percent of convictions overturned due to DNA evidence involved eyewitness misidentification. Innocence Project, *Fact Sheet: Leading Causes of Wrongful Convictions* (2007), http://www.innocenceproject.org/Content/351. php.

The State's Attorney General already has recognized that eyewitness identification "evidence is not fool-proof," and made New Jersey the first state to adopt the United States Department of Justice's procedural recommendations to increase reliability in photo and live lineups. Letter from Attorney General John J. Farmer, Jr., to All County Prosecutors et al., at 1 (Apr. 18, 2001) (accompanying *Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures* ). Indeed, we commended the Attorney General for having improved pretrial identification procedures. *See State v. Delgado*, 188 *N.J.* 48, 62, 902 *A.*2d 888 (2006). However, when we perceive, as we do here, that more might be done to advance the reliability of our criminal justice system, our supervisory authority over the crimi-

nal courts enables us constitutionally to act. *See N.J. Const.* art. VI, § 2, ¶ 3; *Delgado, supra,* 188 *N.J.* at 62, 902 *A.*2d 888.

We recognize that "the eyewitness is probably the single most common form of witness in many criminal trials." Cutler & Penrod, *supra,* at 6. Eyewitness identifications are often "considered direct evidence of guilt" and accorded great importance by juries. Otto H. MacLin & Roy S. Malpass, *The Other–Race Effect and Contemporary Criminal Justice: Eyewitness Identification and Jury Decision Making,* 7 *Psychol. Pub. Pol'y & L.* 98, 98 (2001). Jurors likely will believe eyewitness testimony "when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all." *Watkins v. Sowders,* 449 *U.S.* 341, 352, 101 *S.Ct.* 654, 661, 66 *L.Ed.*2d 549, 558 (1981) (Brennan, J., dissenting) (quoting Elizabeth F. Loftus, *Eyewitness Testimony* 237–247 (1979)). "[T]here is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' " *Id.* at 352, 101 *S.Ct.* at 661, 66 *L.Ed.*2d at 558–59.

■ We believe that particular care need be taken in respect of this powerful evidence—the eyewitness. Thus, although our present model charge on out-of-court identifications adequately cautions juries in that respect, and did so for defendant, we have been prompted to examine our model charge to determine whether it might stand further improvement. In light of the social science research noting the fallibility of eyewitness identifications, we direct that the charge should underscore, for jurors in all eyewitness identification cases, that eyewitness identification testimony requires close scrutiny and should not be accepted uncritically. Accordingly, we shall require that the following additional language be included in the out-of-court identification charge immediately before the enumeration of factors to be considered by the jury when it gauges the reliability and believability of an eyewitness's identification:

Although nothing may appear more convincing than a witness's categorical identifi-cation of a perpetrator, you must critically analyze such testimony. Such identifi-cations, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification. In deciding what weight, if any, to give to the identification testimony, you may consider the following factors:

[*Model Jury Charge (Criminal)*, Identification: Out-of-Court Identification (2007) (New language underscored).]

We refer the model charge on out-of-court identifications to the Model Jury Charge Committee for action implementing the direction contained in this opinion. Trial courts, however, should utilize the above language while the model charge is being revised by the Committee.

### III.

■ Defendant also challenges the identification procedure used in this matter. He contends that he was subjected to an impermissibly suggestive showup that could not be overcome by indicia of reliability in the identification.

■ Recently, in *State v. Herrera*, 187 *N.J.* 493, 503–04, 902 *A.*2d 177 (2006), we reaffirmed use of the United States Supreme Court's two-step analysis to determine the admissibility of out-of-court identifications. *See Manson v. Brathwaite*, 432 *U.S.* 98, 110, 97 *S.Ct.* 2243, 2251, 53 *L.Ed.*2d 140, 151 (1977); *Neil v. Biggers*, 409 *U.S.* 188, 198–99, 93 *S.Ct.* 375, 382, 34 *L.Ed.*2d 401, 411 (1972); *State v. Madison*, 109 *N.J.* 223, 233, 536 *A.*2d 254 (1988). First, a reviewing court must "ascertain whether the identification procedure was impermissibly suggestive." *Herrera, supra*, 187 *N.J.* at 503, 902 *A.*2d 177. If it was impermissibly suggestive, that does not end the inquiry. Next, a court must determine "whether the impermissibly suggestive procedure was nevertheless reliable" by considering the "totality of the circumstances" and "weighing the suggestive nature of the identification against the reliability of the identification." *Id.* at 503–04, 902 *A.*2d 177. Although "one-on-one showups are inherently suggestive" and we said in *Herrera* that "only a little more is required in a showup to tip the scale

toward impermissibly suggestive," nevertheless, "standing alone a showup is not so impermissibly suggestive to warrant proceeding to the second step." *Id.* at 504, 902 *A.*2d 177. Each showup setting must necessarily stand or fall on its own unique facts.

For example, in *Herrera,* we identified situations when a show-up becomes impermissibly suggestive, such as when police described the defendant to the victim as the man found driving her stolen car or when an officer told the victim "[w]e got him" prior to the identification. *Id.* at 505, 902 *A.*2d 177. However, we also identified situations in which a victim's identification of a suspect in handcuffs and seated in a patrol car was not impermissibly suggestive, nor was an officer's comment that "merely informed [the witness] that a suspect had been apprehended." *Ibid.* After considering those illustrations, *Herrera* held that when the officer informed the victim that they had apprehended a man driving the victim's stolen car and would take the victim to the hospital to identify him, the officers initiated an impermissibly suggestive showup. *Id.* at 506, 902 *A.*2d 177.

The facts in this matter differ from those in *Herrera.* On the afternoon of November 4, 2001, Cavaliere happened to see the man he believed to be his attacker walking in front of his house and "recognized his face right away." Cavaliere immediately called the police, who arrived fifteen minutes later. The police drove Cavaliere around for fifteen minutes to search for the man Cavaliere had just seen and whom he believed to be his attacker, but they were unsuccessful in their search and returned Cavaliere to his home. Five minutes later, the police saw defendant, who matched the description that Cavaliere had just provided, walking in the same neighborhood. The officer arrested him and returned to Cavaliere's home ten minutes later with defendant in the back of the patrol car. The officers parked around the corner and summoned Cavaliere to the car.

Although the officer testified that he did not recall whether he said anything to Cavaliere before bringing him to view defendant, Cavaliere testified that he recalled the officer telling him, "we

have somebody that fits the description [that] you described," and asked "[w]hy don't you take a walk around the corner with us and see if this is the person." Cavaliere viewed defendant through the side window of the patrol car and identified him as his attacker.

The identification procedure here was not impermissibly suggestive in that it originated from the victim's own observation of someone he believed was his assailant. Had he and the officers found defendant walking down the street when they were canvassing the neighborhood together, that would not have constituted an impermissibly suggestive showup. Yet when the officers and Cavaliere separated and the officers, minutes later, saw defendant in the vicinity matching the description Cavaliere had just provided, bringing defendant into Cavaliere's view was not the type of showup that is fraught with the worries typically generated by a suggestive police-initiated showup. Indeed, it appears that the responding officers' action was motivated by a concern not to detain a potentially innocent person. *See United States v. Bautista*, 23 *F*.3d 726, 730 (2d Cir.1994) ("[A] prompt showing of a detained suspect at the scene of arrest has a very valid function: to prevent the mistaken arrest of innocent persons.").

Moreover, after the officers arrested defendant, they told Cavaliere only that they had detained someone who fit the description given by Cavaliere minutes earlier. *See United States v. McGrath*, 89 *F.Supp.*2d 569, 581 (E.D.Pa.2000) (finding that police officer's comments "suggesting only that the police had a possible suspect in custody" did not create impermissibly suggestive showup). The fact that defendant was handcuffed in the police car did not convert this showup identification into one that was impermissibly suggestive. *See State v. Wilson*, 362 *N.J.Super*. 319, 327, 827 *A*.2d 1143 (App.Div.) ("[T]here is no question that there was suggestiveness present because the defendant was identified while seated and handcuffed in the back of a police car. However, such suggestive circumstances did not render the identification procedure *per se* improper and unconstitutional."), *certif. denied*, 178 *N.J.* 250, 837 *A*.2d 1092 (2003). In presenting a man fitting

Cavaliere's unsolicited description, the police made no representations that he was the man who attacked Cavaliere, only that he matched Cavaliere's description. We conclude that this showup was not impermissibly suggestive.

Nevertheless, even if we were to conclude that this showup was impermissibly suggestive, the identification may be admissible if it was sufficiently reliable under the totality of the circumstances. *Herrera, supra,* 187 *N.J.* at 503–04, 902 *A.*2d 177. Considering all the circumstances, we conclude that Cavaliere's identification of defendant was sufficiently reliable. Cavaliere had ample opportunity to view defendant on the night of the attack, identified him when observing him only days after the attack, and did so without police intervention. He identified defendant again minutes after searching for him with the police, notwithstanding that the police officers were the ones to spot defendant in the search area wearing clothes described by Cavaliere. In sum, this showup identification withstands scrutiny.

## IV.

Defendant also raises certain sentencing arguments. Before this Court he raises for the first time an assertion that his sentence was excessive because the sentencing court failed to merge his convictions for third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(d) (Count Four) into his conviction for first-degree robbery, *N.J.S.A.* 2C:15–1 (Count One). When possession of a weapon for an unlawful purpose "is coupled with a charge of an act accomplished with the [weapon]," "the use of the [weapon] to commit the substantive offense[,] such as robbery, assault or homicide, provides the factual underpinning for drawing an inference that the [weapon] was possessed for an unlawful purpose." *State v. Diaz,* 144 *N.J.* 628, 636, 677 *A.*2d 1120 (1996) (quoting *State v. Jenkins,* 234 *N.J.Super.* 311, 315, 560 *A.*2d 1240 (App.Div.1989)) (citing *State v. Daniels,* 231 *N.J.Super.* 555, 559–60, 555 *A.*2d 1180 (App.Div.1989)). Merger must occur

"[w]hen the only unlawful purpose in possessing the [weapon] is to use it to commit the substantive offense." *Ibid.*

In opposing defendant's merger request, the State concedes that had defendant raised this objection earlier—had the argument even been raised in the petition for certification—it "would not have objected to a limited remand so that [C]ount [F]our, third-degree possession of a weapon for an unlawful purpose, could be merged into [C]ount [O]ne, first-degree robbery."

We agree with the State that defendant could have and should have raised the issue earlier. Merger issues, however, "implicate a defendant's substantive state constitutional rights." *Diaz, supra,* 144 *N.J.* at 637, 677 *A.*2d 1120 (citing *State v. Dillihay,* 127 *N.J.* 42, 46–47, 601 *A.*2d 1149 (1992); *State v. Cole,* 120 *N.J.* 321, 327, 576 *A.*2d 864 (1990)). At its core, merger's substantial purpose "is to avoid double punishment for a single wrongdoing." *Ibid.* (citing *State v. Brown,* 138 *N.J.* 481, 561, 651 *A.*2d 19 (1994); *Cole, supra,* 120 *N.J.* at 325–27, 576 *A.*2d 864; *State v. Davis,* 68 *N.J.* 69, 77, 342 *A.*2d 841 (1975)). The failure to merge convictions results in an illegal sentence for which there is no procedural time limit for correction. *See R.* 3:22–2(c); *R.* 3:22–12(a). Defendant, therefore, did not waive his right to challenge the trial court's failure to merge his sentences by his tardy objection. *See also State v. Truglia,* 97 *N.J.* 513, 480 *A.*2d 912 (1984). Acknowledging, as one must, that the only use of the knife in this matter was to commit the substantive offense of first-degree robbery, we remand for the merger of defendant's conviction for third-degree possession of a weapon for an unlawful purpose (Count Four), into his conviction for first-degree robbery (Count One).

In addition, the State concedes that defendant is entitled to re-sentencing pursuant to *State v. Natale,* 184 *N.J.* 458, 878 *A.*2d 724 (2005), on his conviction for third-degree aggravated assault because the sentence imposed was greater than the presumptive term for the range. Therefore, we hold that the remand also shall include defendant's re-sentencing on Count Three.

## V.

The judgment of the Appellate Division affirming defendant's convictions is affirmed. The matter is reversed and remanded only for purposes of re-sentencing defendant consistent with Section IV of this opinion.

Justice ALBIN, concurring.

I concur with the majority that the out-of-court identification procedure and the identification charge to the jury in this case complied with constitutional norms, and concur with its resolution of the sentencing issues. I am also pleased that Justice LaVecchia's thoughtful opinion has refined the identification charge to alert jurors to the inherent dangers associated with identification testimony. However, I continue to adhere to my dissent in *State v. Herrera*, 187 *N.J.* 493, 528, 902 *A.*2d 177 (2006), in which I stated that "[i]t is time for this Court to announce that the use of unnecessarily suggestive identification procedures violates the due process guarantees of Article I, Paragraph 1 of the New Jersey Constitution." The current standard permits highly suggestive identification procedures, however unnecessary, so long as a court later ratifies the identification as otherwise reliable. *See id.* at 506–07, 902 *A.*2d 177 (majority opinion). Because we recognize that misidentifications are the single greatest cause of wrongful convictions, I believe that this Court has an obligation to discourage law enforcement from using highly suggestive identification techniques, such as showups, when there is no exigency.

A showup—the displaying of only one suspect to a witness—" 'is particularly conducive to misidentification[ ],' " and for that reason the practice has " 'been widely condemned.' " *Id.* at 525–26, 902 *A.*2d 177 (Albin, J., dissenting) (citations omitted). One commentator has described the showup as " 'the most grossly suggestive identification procedure now or ever used by the police.' " *Id.* at 525, 902 *A.*2d 177 (quoting Patrick M. Wall, *Eye–Witness Identification in Criminal Cases* 28 (1965)). As I indicated in my dissent in *Herrera*, "[t]o a person whose fate depends on the accuracy of

an identification, it is fundamentally unfair for the police to unnecessarily employ a technique that maximizes the potential for error." *Id.* at 528, 902 *A*.2d 177.

The Court in *Herrera* did not dismiss out-of-hand my call for a new identification standard discouraging unnecessary showups, but rather concluded that the issue had not been properly raised at trial. The Court noted:

> We have no reason to doubt that if defendant had raised these arguments before the trial court and submitted the current research in support of his request for a new standard for determining the admissibility of showup identification, a different record would have been made. The trial court would have received the evidence and made its decision, and the Appellate Division then would have had a full record to review. In that event, the arguments defendant now makes would be properly before us. In the absence of such a record, and in light of our consistent application of federal constitutional precedent in deciding the admissibility of identification evidence, we decline to adopt a new standard under our state constitution.
>
> [*Id.* at 501, 902 *A*.2d 177 (majority opinion).]

In this case as well, defendant did not challenge the current identification standard that allows the unnecessary use of highly suggestive identification procedures such as the showup. Although I am prepared to address the issue now, I understand the Court's reluctance to entertain a matter that has not been raised below. I anticipate that in an appropriate case the issue will be raised and a proper record developed so that the Court will have an opportunity to revisit a standard that, I fear, is responsible for increasing the number of misidentifications and wrongful convictions. I am nonetheless heartened that the Court today has taken a positive step toward addressing the general problem of mistaken identifications.

Because in this case I conclude that the showup was not an unnecessary identification procedure (the police had picked up defendant who fit the precise description given by the victim minutes earlier and could not continue to hold him unless the victim confirmed that he was the perpetrator), I would affirm the judgment of conviction.

Justice LONG joins in this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice ZAZZALI and Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—5.

*For concurrence*—Justices LONG and ALBIN—2.