785 A.2d 940 (2001)
345 N.J. Super. 490
STATE of New Jersey, Plaintiff-Respondent,
v.
Maurice VALENTINE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 17, 2001.
Decided December 13, 2001.
*941 Peter A. Garcia, Acting Public Defender, attorney for appellant (Sylvia Orenstein, Assistant Deputy Public Defender, of counsel and on the brief).
Donald C. Campolo, Acting Essex County Prosecutor, attorney for respondent (Kenneth P. Ply, Special Deputy Attorney General, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, LEFELT and LISA.
The opinion of the court was delivered by RODRIGUEZ, A.A., J.A.D.
In this appeal we hold that State v. Cromedy, 158 N.J. 112, 727 A.2d 457 (1999), which requires a special cross-racial identification jury instruction in appropriate cases, does not require the giving of a "cross-ethnic" identification jury instruction.

I
Following a jury trial, defendant, Maurice Valentine, was convicted of first degree robbery of Edwin Negron on August 13, 1998, N.J.S.A. 2C:15-1; two counts of third degree possession of a firearm, N.J.S.A. 2C:39-5c; two counts of third degree possession of a sawed-off shotgun, N.J.S.A. 2C:39-3b; and second degree possession of a weapon with the intent to use it unlawfully, N.J.S.A. 2C:39-4a. After the jurors announced the verdict, they were asked to consider the additional charge of second degree possession of a weapon by a convicted felon, N.J.S.A. 2C:39-7b. The jury returned a verdict of guilty on that charge.
After appropriate mergers of some of the convictions, the judge imposed concurrent terms aggregating twenty years with a period of parole ineligibility of at least ten years pursuant to the Graves Act, N.J.S.A. 2C:43-6c to -6d, and eighty-five percent of the base term pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We affirm.

II
The evidence presented by the state can be summarized as follows. On August 13, 1998, Negron, age twenty-five, went to a housing project at Prince Street in Newark to purchase illicit drugs. At the time, he was a heroin abuser. He entered the building's lobby carrying a radio. He noticed a man standing inside. Negron was going to ask the man, "if he had anything," when another man, whom he later identified as defendant, approached from behind. Defendant pushed Negron against the wall and pulled a sawed-off shotgun from a blue bag that he was carrying. He pointed it at Negron and said that if Negron did not give him his money, he would be shot. According to Negron, after defendant *942 demanded the money, he "became paralyzed." He did not provide the money quickly. Defendant struck him with the shotgun. Negron thought that somebody came around behind him and grabbed his hands. He noticed other men standing around, although he did not get a good look at any of them. The men were laughing as if it was a joke. As Negron turned his head around, he was struck a second time with the shotgun, this time in the back of his head. He began to bleed and became disoriented. He took the money out of his pocket and gave it to defendant along with the radio.
Negron ran out of the building to the security booth. He was still bleeding from the cut on the back of his head. Near the security booth, he spoke to Jeanette Martin. She told Negron that she had seen everything. He and Martin reported the incident to the security guard. The security guard called the police to handle the situation. However, Negron did not wait for the police to arrive. He was scared to remain on the premises because defendant had threatened to kill him. Negron went to his grandmother's house nearby to tend to his cut. He reported the incident to the security guard at his grandmother's building at Martin Luther King Boulevard.
Responding police officers met Negron at his grandmother's building. He was taken to the robbery unit at the police station. He informed the police that his assailant was a dark-skinned male, about 5'8", 170 to 190 pounds, between twentyfive and thirty-five years old, with dark gold-rimmed glasses and a striped shirt. He also informed the police that the man had a sawed-off shot gun which he carried in a blue bag. Negron looked through photograph books at headquarters. He was not able to find a photograph of his assailant.
Negron admits lying to the police regarding the location where the attack took place because his purpose for being there was illegal. He told the police that he had gone to a store to purchase cigarettes and had been assaulted at the intersection of Spruce and Somerset streets. When Negron and the police officers went to that intersection in an attempt to locate the assailant, this attempt was unsuccessful.
The next evening, Negron was asked to return to the police station. The police had arrested the defendant while he was in possession of a sawed-off shotgun. The defendant fit Negron's description. Negron was shown another photo array with six photographs of dark-skinned males wearing glasses with gold rims. Negron selected defendant's photograph and signed the back. Negron then changed his statement to indicate the correct location of the attack. He explained his reasons for lying to the police on the previous statement.
At trial, Negron identified defendant as the assailant. He noted that defendant was not then wearing gold-rimmed glasses at trial. Negron also identified the shotgun seized from defendant as the instrument with which he was twice hit over the head. A pair of gold-rimmed eyeglasses, worn by defendant at the time of his arrest, were introduced in evidence.
Jeanette Martin testified for the state. According to her, on the date of the incident, she resided at the housing projects where the attack took place. As she was going to the lobby to retrieve her mail, the elevator door opened. She saw a group of young men standing by the door. Then she saw defendant hit Negron on the head with a sawed-off shotgun. She observed defendant taking Negron's money. Martin described defendant as "dark-skinned, short hair, [with] gold framed glasses on and thick lips."
Negron ran outside. Martin followed him to the security booth. The security *943 guard attempted to call an ambulance. Negron stated that he did not want to stay. Negron subsequently left the area. Several days later, Martin was asked to come to the police station. She was shown photo books. However, she did not make an identification.
At trial, Martin contradicted some of her earlier statements to the police. These contradictions were brought out through the testimony of a Newark police officer who witnessed her statement. She also told the jury that one week before trial she had selected defendant's photograph from a photo array at the Prosecutor's Office. This statement was contradicted by the testimony of a Prosecutor's investigator, who testified for defendant.
Newark Police Officer José Sosa, testified that on the date of the incident he reported to Negron's grandmother's house. He took Negron to the scene. When Negron could not identify a suspect, Sosa took him to the police station.
Newark Police Officer Marion Reynolds, testified that on the day after the assault, he and his partner, David Figarora, were assigned to the public housing section. While patrolling the Prince Street projects, the officers observed a person who fit the description they had been given. The suspect, later identified as defendant, was standing with a group of men. The uniformed officers exited the unmarked patrol car and began to approach defendant. Defendant, upon spotting the officers, fled the scene. The officers chased him. Defendant entered a building and ran up to the eighth floor. Reynolds saw the suspect clutching at his left leg. Officer Figarora ordered defendant to raise his hands. Defendant complied. Figarora frisked defendant and retrieved a sawedoff shot gun. Defendant was arrested. At the time of arrest, defendant was wearing gold-rimmed eyeglasses. Newark Police Detective Louis Alarcon qualified as an expert in ballistics and firearms. He testified that the weapon seized from defendant was operable. He also testified that the barrel of such weapon was normally twenty-eight inches. However, this particular weapon's barrel had been shortened to twelve inches. He opined that a person might shorten the barrel of a gun for "maneuverability" and "concealability."
Defendant did not testify. He presented the testimony of a Newark police officer and an Essex County Prosecutor's investigator. These witnesses contradicted Martin's trial testimony by testifying about her prior inconsistent statements.

III
On appeal, defendant contends that the judge erred by refusing to give the jury a special instruction on crossracial identification pursuant to State v. Cromedy, 158 N.J. 112, 727 A.2d 457 (1999). This request by defendant was made with respect to Negron's identification. The prosecutor did not urge that Martin was making a cross-racial identification, therefore we assume that she and defendant are of the same race. The judge's refusal was premised on his conclusions that: (1) the identification testimony was corroborated by other evidence and (2) defendant had not demonstrated that Negron's identification was across racial lines. We agree with the judge. From our thorough review of the record, we conclude that the testimony of Martin, the seizure of a sawed-off shotgun from defendant the day after the incident in the same housing project, defendant's flight upon seeing the police officers, and the presence of the gold-rimmed eyeglasses, constitute other evidence giving Negron's identification independent reliability. Under these circumstances, the cross-racial identification special instruction need not be given. Id. at 132, 727 A.2d 457. Moreover, like the trial judge, we are not satisfied that *944 defendant has shown that he and Negron are of different races.
The Supreme Court has held that the trial court's failure to give a requested instruction regarding cross-racial identification may constitute reversible error. Id. at 115, 727 A.2d 457. In Cromedy, the court held that such instruction should be given when "identification is a critical issue in the case and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." Id. at 132, 727 A.2d 457. In those circumstances, the jury should be given a cautionary instruction that it should pay close attention to the possible influence of race on the accuracy of the identification. Id. at 133, 727 A.2d 457.
Here, defendant's basis for seeking the charge was that defendant is an African-American and Negron is Hispanic. However, Hispanic is not a race. It is a cultural term, an ethnic identification. The American Heritage College Dictionary gives the following definition:
His-pan-ic adj. 1. Of or relating to Spain or Spanish-speaking Latin America. 2. Of or relating to a Spanish-speaking people or culture. -n. 1. A Spanishspeaking person. 2. A U.S. citizen or resident of Latin-America of Spanish descent. [Lat. HispanicusHispania, Spain.]
Usage Note: There are a number of words denoting persons who trace their origins to a Spanish country or culture. Hispanic encompasses all Spanishspeaking peoples in both hemispheres and emphasizes the common denominator of language between communities that sometimes have little else in common. It is widely used in both official and unofficial contexts and is entirely acceptable.

[American College Dictionary, 3rd edition, Houghton Mifflin Co., Boston & New York, (1993) ].
Thus, Hispanics are of different races, i.e. African-American, Caucasian, Native-American, or Asian. All of these races are represented among Hispanics living in the urban centers of this state. A Hispanic person can also be of multi-racial descent.
Here, the trial judge and prosecutor concluded that Negron was of "Spanish and African background." Therefore, the judge found that there was no cross-racial identification. Defendant did not dispute this conclusion. We have no warrant to dispute that conclusion by the trial judge.
Defendant suggests that a "cross-ethnic" jury instruction would have been appropriate here. However, Cromedy does not support such an instruction. The Cromedy opinion clearly states that "a crossracial identification occurs when an eyewitness is asked to identify a person of another race." Id. at 120, 727 A.2d 457. The opinion goes on to detail empirical studies concerning the effect of "own-race effect" or "own-race bias." Id. at 121, 727 A.2d 457. The corollary of own-race effect "is that eyewitnesses experience a `cross-racial impairment' when identifying members of another race." Ibid. Thus, the Cromedy opinion focused on race, not ethnicity or cultural identification. The reason is obvious, members of the same race may have different ethnic self-identifications. Put a different way, a person of African descent raised in the United States will have many cultural differences with a person of African descent raised in the Dominican Republic. However, there will be no difference in racial characteristics. Yet, one would be in the ethnic category "Hispanic" and the other one will not.
Defendant's brief asserts that "Hispanics, like African-Americans, constitute a legally cognizable group." Defendant then cites various authorities for the principle that in jury selection scenarios, Hispanics cannot be the target of peremptory *945 challenges. See State v. Gilmore, 103 N.J. 508, 535-36, 511 A.2d 1150 (1986). This is true. However, it does not mean that Hispanics and African Americans constitute mutually exclusive groups, i.e. either one or the other. There are many Hispanics of African descent.
Moreover, the rationale of Gilmore and similar cases is to protect minority groups from conscious discrimination during jury selections. Cromedy deals with the unconscious and uncontrolled "decreased accuracy in the recognition of other-race faces." Cromedy, supra, 158 N.J. at 131, 727 A.2d 457 (quoting Sheri Lynn Johnson Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L.Rev. 934, 942 (1984)).

IV
[The Court's discussion of unrelated issues is redacted for publication purposes.]
Affirmed.