8 A.3d 844 (2010)
417 N.J. Super. 154
STATE of New Jersey, Plaintiff-Respondent,
v.
Jashown WALKER, Defendant-Appellant.
Docket No. A-1137-08T4.
Superior Court of New Jersey, Appellate Division.
Submitted September 21, 2010.
Decided December 13, 2010.
*845 Yvonne Smith Segars, Public Defender, attorney for appellant (Raquel Y. Bristol, Assistant Deputy Public Defender, of counsel and on the brief).
Robert D. Laurino, Acting Essex County Prosecutor, attorney for respondent (Sara A. Friedman, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).
Before Judges CARCHMAN, MESSANO and WAUGH.
The opinion of the court was delivered by
MESSANO, J.A.D.
Defendant Jashown Walker appeals from the judgment of conviction and sentence imposed following a jury trial at which he was found guilty of second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and 2C:15-1; and second-degree robbery, N.J.S.A. 2C:15-1. After appropriately merging the two counts, the judge sentenced defendant to a seven-year term of imprisonment with an 85% period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. Defendant raises the following points on appeal:
POINT I
THE TRIAL COURT'S DENIAL OF THE DEFENSE REQUEST FOR A JURY INSTRUCTION ON CROSS-RACIAL IDENTIFICATION DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART. 1, PAR. 1, 10
POINT II
DEFENDANT'S SENTENCE IS EXCESSIVE.
We have considered these arguments in light of the record and applicable legal standards. We reverse.
Defendant and co-defendant Johnathan Thompson were tried together. The evidence at trial revealed that on August 13, 2007, Paul Marchak was employed at a Blimpie's sandwich shop located on Halsey Street in Newark where he had worked for two years as a counter attendant and deliveryman.[1] At approximately 7:00 p.m., Marchak was making two deliveries to a nearby apartment building. As he neared the address, Marchak noticed a group of *846 approximately ten men and women gathered around a car.
Passing the group, Marchak was grabbed by a tall man having "dread lock hair" and wearing a "white football jersey with the number seven on it." This man punched him in the face and pushed him to the ground. A shorter man wearing a white tee shirt and shorts went through his pockets and grabbed his wallet. Marchak was on the ground for five minutes while being hit and kicked by a total of four individuals. He covered his face for protection.
While Marchak was still on the ground, a car stopped and a woman in the car yelled at the assailants to give back Marchak's wallet. At that point, the shorter man threw the wallet in the air and both men let Marchak go. He ran to the apartment building, explained to the security guard that he had been robbed, and the guard called the police.
Newark Police Officer Eric Mans and another officer responded at 7:33 p.m. Marchak provided them with a description of only two of his assailants"a tall black male with short dreads wearing a white football jersey with the number seven on it and a shorter [b]lack male with blue jeans and a dirty white tee shirt." The officers placed Marchak in their patrol car and drove around the area in an effort to locate any suspects.
Approximately fifteen minutes later, as the police car approached a group of people standing in an alley near Halsey Street and Maiden Lane, Marchak "started screaming `that's them, that's two of them that robbed me.'" Mans exited his patrol car and approached the group. Everyone began to disperse, but "two of the suspects turn[ed] their back[s] ... and started walking faster west on Maiden Lane." The officers apprehended and arrested defendant and Thompson, at which point Marchak confirmed his identification of them. Defendant and Thompson "were wearing the same [clothing] that the victim had described .... [T]he tall on[e] had ... the white jersey with the number seven on it. The short one had blue shorts with the white dirty tee-shirt." Mans acknowledged on cross-examination when confronted with his report that Thompson was wearing blue jeans when arrested.[2]
After defendant's arrest, the officers drove Marchak back to the scene of the robbery, where he retrieved his wallet from the street. All of the money, $147, was missing. Marchak was treated for some bruises and swelling on his face. During the arrest procedures, police recovered a total of $40 from defendant and placed it into evidence; $35 was recovered from Thompson, but, believing it was not evidential, the police did not seize the money.
Marchak identified defendant in court as the taller of his assailants and Thompson as the shorter one who rifled through his pockets. Marchak acknowledged on cross-examination that he could not remember what his assailants "looked like," and that he could "barely" remember the events of the day. Defendant and Thompson did not testify, and no defense witnesses were called.
Defendant requested a cross-racial identification charge. The State eventually opposed the request. After initially reserving decision, the judge denied defendant's request. The jury convicted defendant, but acquitted Thompson.
*847 Defendant contends the judge committed reversible error in refusing to give a cross-racial identification instruction because Marchak is Caucasian and he is African-American, identification was the critical issue in the case, and Marchak's identification was not corroborated by any other evidence. During colloquy with defense counsel after she requested the charge, and before the prosecutor lodged any objection, the judge made the following observations:
[Marchak] is an individual who has had substantial contacts with the urban community. This is not a situation where somebody is coming down from Basking Ridge to buy drugs on one occasion.... [J]ust because the victim is Caucasian and the defendant[] [is] African-American, that doesn't mean [ipso] facto I have got to charge the language in the identification charge under [C]romedy.[3]
After acknowledging that "identification [wa]s a central issue in the case," the judge continued:
I mean, we'd have to be blind to the fact that someone who works for Blimpie[']s in downtown Newark and someone who also works for Hobbie's in downtown Newark does not have substantial connection with African[-]Americans and/or individuals who are not of the ... Caucasian race. This is not a situation like I've said you've got someone [c]oming down [from] the suburbs to buy drugs who lives in an isolated situation in an exclusive area that goes to Del Barton High School and doesn't have contacts with the minority community.
This is a guy who has been to State prison, has been in contact with all different kinds of people in State Prison....[4]
Under these facts in this case I don't think that the fact that this victim was Caucasian has anything to do with any identification or alleged misidentification of th[is] defendant[]. I think there are other factors which are at play here but I don't see the dictates of [C]romedy.

Defense counsel continued her argument.
[T]he point of [C]romedy is not that you know people of the other race but that the fact that you are of a different race, that in and of itself studies have shown people have a harder time determining or noticing characteristics of the other race. It's not just that you have had contacts with the other race....
The judge reserved decision, but the next day, after the State formally objected to the charge, the judge ruled:
I think what the State has to its benefit is that the identification was made ... soon after the alleged activities occurred....
There should have been some corroborating evidence ... [but] th[is] is more about the opportunity that the victim had to observe the two individuals....
I just don't believe [the cross-racial identification charge] applies in this particular case. I think it might inject some racial aspects to this case which I really did not see at all in any of the testimony from the victim or any of the witnesses.
Noting again that Marchak "ha[d] substantial contacts with African[-]Americans and with Caucasi[a]ns," the judge denied defendant's request.
"A cross-racial identification occurs when an eyewitness is asked to identify a *848 person of another race." Cromedy, supra, 158 N.J. at 120, 727 A.2d 457. Our Model Jury Charge (Criminal), "Identification: In-court and Out-of-court Identifications," (June 2007), provides in relevant part that among other factors, jurors should consider "[t]he fact that an identifying witness is not of the same race as ... defendant, and whether that fact might have had an impact on the accuracy of the witness's original perception, and/or the accuracy of the subsequent identification." The charge further requires jurors to "consider that in ordinary human experience, people may have greater difficulty in accurately identifying members of a different race."
However, not every cross-racial identification triggers an obligation to give the jury an instruction. As the Cromedy Court noted:
[U]nrestricted use of cross-racial identification instructions could be counterproductive.... The simple fact pattern of a white victim of a violent crime at the hands of a black assailant would not automatically give rise to the need for a cross-racial identification charge. More is required.
A cross-racial instruction should be given only when ... identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability.
[Cromedy, supra, 158 N.J. at 132, 727 A.2d 457 (emphasis added).]
The Court has reaffirmed the vitality of Cromedy in situations where the cross-racial identification was "critical to the outcome of the case," and the corroborating evidence was lacking in credibility and reliability. State v. Ways, 180 N.J. 171, 198-99, 850 A.2d 440 (2004).
In this case, the judge acknowledged that "identification [wa]s a central issue in the case." He further observed "[t]here should have been some additional corroborating evidence," implicitly recognizing the lack of any independent corroboration of Marchak's identification of defendant.
Nevertheless, in concluding a cross-racial identification charge was not necessary, the judge in this case repeatedly observed that Marchak worked in downtown Newark and had "substantial connection with African[-]Americans." However, as defense counsel noted, the Court's holding in Cromedy was based upon the fact that "eyewitnesses experience a `cross-racial impairment' when identifying members of another race," 158 N.J. at 121, 727 A.2d 457, with "`decreased accuracy in the recognition of other-race faces [that] is not within the observer's conscious control.'" Id. at 131, 727 A.2d 457 (quoting Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L.Rev. 934, 942 (1984)). Whether such "impairment" is reduced through exposure to members of a different race was simply not discussed by the Court, nor did the judge in this case cite any authority for that proposition.
The judge also concluded that the identification testimony did not involve race, but was "more about the opportunity that the victim had to observe the two individuals." However, the Court in Cromedy recognized that possible inherent bias in a cross-racial identification is simply one factor for the jury to assess among the totality of factors regarding identification testimony, including the opportunity the victim had to observe the perpetrator. 158 N.J. at 133, 727 A.2d 457. In short, a cross-racial identification charge should have been provided to the jury in this case.[5]
*849 The State seeks to distinguish this case through comparison to State v. Harris, 357 N.J.Super. 532, 538, 816 A.2d 171 (App. Div.2003), where we concluded there was no error in refusing to give the Cromedy charge. There, however, the defendant was identified not only by the victim, who was of a different race, but also by another witness of the same race. Ibid. Additionally, we noted the strong corroborative evidence, in particular, the fact that the defendant was found wearing the victim's jacket shortly after the crime. Ibid. In short, we concluded that Harris "was not a case where identification was `a critical issue' or where [the victim's] identification of defendant `[was] not corroborated by other evidence giving it independent reliability.'" Ibid. (quoting Cromedy, supra, 158 N.J. at 132, 727 A.2d 457).
Marchak's identification was the only issue here, and he was the only person who identified defendant. There was no independent corroboration of that identification through physical evidence, except for Marchak's description of defendant's clothingthe football jerseywhich Marchak stressed was critical to his identification of defendant; the jersey was never seized as evidence nor produced at trial.
Our decision in State v. Murray, 338 N.J.Super. 80, 89, 768 A.2d 221 (App.Div.), certif. denied, 169 N.J. 608, 782 A.2d 426 (2001), is also distinguishable. There, we concluded that the failure to give a Cromedy charge was not plain error because of the specific conditions surrounding the identification. In Murray, a Drug Enforcement Administration (DEA) agent, after engaging in an undercover drug transaction with the defendant, provided a description to her fellow officers. Id. at 86, 768 A.2d 221. Along with detectives, she then returned in a car to the area where the transaction occurred, and, as her fellow detectives spoke to the defendant on the street, the agent identified him as she sat in the car. Ibid.
In concluding that the failure to sua sponte give a cross-racial identification charge was not plain error, we noted that the DEA agent viewed the defendant from a short distance during the drug transaction, that she was "not the victim of a violent crime, which made her nervous or upset," as was the victim in Cromedy, that she had undergone special training regarding observation of facial characteristics, that the area was well-lit when she made her observations and identified the defendant, and that the agent identified defendant "within minutes after her initial encounter with him." Id. at 89-90, 768 A.2d 221.
Here, Marchak's encounter with defendant was not planned or calculated, and he was not specially trained in facial recognition. Indeed, he admitted he could remember nothing about the facial description of either assailant. Although we conclude that the facts of this case required *850 the judge to provide the jurors with a cross-racial identification charge, we must nevertheless consider whether the failure to give the charge amounted to harmful error requiring reversal.
As the Court has noted,
In general, it is speculative to forecast what verdict a jury would have returned if properly instructed on the basis of the verdict that a jury returned after an incomplete instruction. We have cautioned that appropriate and proper charges to a jury are essential for a fair trial, and erroneous instructions on material issues are presumed to be reversible error, excusable only if they are harmless beyond a reasonable doubt. Such errors are poor candidates for rehabilitation under the harmless error philosophy.
[State v. Crisantos (Arriagas), 102 N.J. 265, 273, 508 A.2d 167 (1986) (quotations and citations omitted).]
We have noted that when general instructions on identification are appropriately requested and refused, "whether th[at] omission requires reversal is highly fact-sensitive." State v. McNeil, 303 N.J.Super. 266, 272, 696 A.2d 757 (App.Div.1997). The same "highly fact-sensitive" analysis applies when the instruction is not requested and the review is conducted under the plain error analysis. State v. King, 372 N.J.Super. 227, 238-40, 858 A.2d 4 (App. Div.2004).
In State v. Davis, 363 N.J.Super. 556, 561, 833 A.2d 1094 (App.Div.2003) (citations omitted), applying plain error analysis and reversing defendant's conviction, we noted that "[t]he failure to give [a general identification] charge or to give an adequate charge is most often reversible error." In State v. Cotto, 182 N.J. 316, 326, 865 A.2d 660 (2005), also applying the plain error standard, the Court approved our analysis in Davis, noting, "that the State may sometimes present such overwhelming corroborative evidence that the `failure to give an identification instruction does not constitute error,' but such cases are the exception. Rather, the trial court is required to issue a `specific instruction' even when defendant's misidentification argument is `thin.'" (quoting Davis, supra, 363 N.J.Super. at 561, 833 A.2d 1094) (emphasis added). The Cotto Court, however, found the error to be harmless in light of the judge's general instructions on the burden of proof, and "the strength and quality of the State's corroborative evidence." Cotto, supra, 182 N.J. at 327, 865 A.2d 660.
In this case, however, defendant properly sought a cross-racial identification and an instruction should have been provided to the jury. In State v. Green, 312 N.J.Super. 456, 465, 712 A.2d 224 (App. Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998), considering the refusal to give the general identification charge, we held "that where requested and where the facts of the case raise a genuine and substantial issue as to identification, the charge must be given."
We acknowledge that the facts of this case present a close question as to whether the failure to give the required cross-racial identification charge was harmful error. We first note that identification was the only issue in this case. However, unlike the circumstances in Cromedy, supra, 158 N.J. at 117, 727 A.2d 457, where the identification was made months after the crime was committed, or Davis, supra, 363 N.J.Super. at 559, 833 A.2d 1094, where the arrest occurred months after the out-of-court identification procedure, Marchak pointed out defendant to the police within approximately one hour of the robbery. Although the out-of-court identification took place soon after the robbery, however, Marchak was admittedly and understandably still excited. See Murray, supra, *851 338 N.J.Super. at 89-90, 768 A.2d 221 (distinguishing Cromedy and noting that a cross-racial identification charge was not necessary because, among other things, the DEA agent "was not the victim of a violent crime, which made her nervous or upset"). Whatever observations Marchak made of the two men were limited to the very short period of time that he was on the ground, covering his face, and defending himself from the assault.
At trial, Marchak identified both defendants as they sat at counsel table, though he acknowledged that he could not remember what they looked like and could "barely" remember the day's events. See Cromedy, supra, 158 N.J. at 131-32, 727 A.2d 457 (noting that "the stress associated with the courtroom atmosphere, based on human experience, is likely to diminish rather than enhance recognition accuracy"). Marchak admitted that he was unable to describe his assailants in any significant detail beyond the clothing they wore.
Second, in this case there was no independent corroboration of the identification through the admission of other evidence, such as the proceeds of the robbery, as in Harris. While it is true that defendant and Thompson walked away as Marchak and the officers approached, so did the other people in the crowd. Marchak claimed that he was robbed of $147, but defendant only had $40 dollars on his person when arrested; any money in Thompson's possession was deemed to be non-evidential. The single item of clothing that corroborated Marchak's initial description of his assailanta white football jersey with the number seven on itwas never introduced at trial. Moreover, an item of clothing that fits the initial physical description provided by the victim, unless particularly idiosyncratic, does not strike us as providing "independent reliability" to the identification. Cromedy, supra, 158 N.J. at 132, 727 A.2d 457.
On balance, therefore, we cannot conclude the judge's refusal to provide a cross-racial identification charge in this case was harmless error beyond a reasonable doubt. Our conclusion is bolstered by recent studies demonstrating that jurors are "largely unfamiliar with th[e] findings" of scientific studies regarding eyewitness identification "and often hold beliefs to the contrary." Special Master's Report, State v. Henderson, supra, at 48 (citation to record omitted). For example, "jurors were substantially less receptive to such concepts as cross-race bias" than were experts in the field. Id. at 49 (citation to record omitted). "[J]urors underestimate the importance of proven indicators of accuracy (e.g., lineup instructions, memory retention interval, lighting conditions, cross-race identification, weapon presence), tend to rely heavily on factors that the research finds are not good indicators of accuracy (e.g., witness confidence), and tend to overestimate witness accuracy rates." Ibid. (citation to record omitted). We are therefore compelled to reverse defendant's conviction. In light of our holding, we need not discuss defendant's second point on appeal.
Reversed and remanded for a new trial.
NOTES
[1] After the incident, Marchak no longer worked at Blimpie's but continued to work in the area at Hobbie's Restaurant.
[2] In summation, Thompson's counsel stressed the difference in the initial description of the pants his client was wearing, "shorts," and the fact that when apprehended Thompson had on a pair of jeans.
[3] State v. Cromedy, 158 N.J. 112, 727 A.2d 457 (1999).
[4] This was a reference to Marchak's prior criminal record that was revealed during his testimony.
[5] The Honorable Geoffrey Gaulkin issued a special master's report on the validity of State law standards on the admissibility of eyewitness identification which is contained in State v. Larry R. Henderson, A-08 (June 18, 2010). On page 14, the report notes that recent scientific opinion and literature has confirmed "a broad consensus as to the variables that can affect the reliability of eyewitness identifications." For example, "while moderate levels of stress improve cognitive processing and might improve accuracy, an eyewitness under high stress is less likely to make a reliable identification of the perpetrator. Stress and fear ensure that the witness will not forget the event, but they interfere with the ability to encode reliable details." Id. at 43 (citations to record omitted). "[A] brief or fleeting contact is less likely to produce an accurate identification than a more prolonged exposure." Id. at 44 (citation to record omitted). Most significantly for purposes of this opinion, "[s]everal meta-analyses published over the past 20 years consistently show that other-race recognition is poorer than same-race recognition." Id. at 48 (citations to record omitted).