43 A.3d 1233 (2012)
426 N.J. Super. 204
STATE of New Jersey, Plaintiff-Respondent,
v.
Renard JOSEPH, Defendant-Appellant.
No. A-5651-09T1
Superior Court of New Jersey, Appellate Division.
Submitted April 30, 2012.
Decided June 4, 2012.
*1237 Joseph E. Krakora, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, on the brief).
Carolyn A. Murray, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).
Before Judges PARRILLO, GRALL and ALVAREZ.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
Tried by a jury, defendant Renard Joseph was convicted of three counts of first-degree armed robbery, N.J.S.A. 2C:15-1(b), and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a), and one count of third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). On the armed robbery convictions, he was sentenced to concurrent eighteen-year prison terms, each with an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and on the second-degree weapons offenses, to concurrent five-year terms with a five-year period of parole ineligibility. The third-degree weapons offense was merged into one of the second-degree weapons convictions. Appropriate fees and penalties were also imposed.
The armed robberies of three individuals occurred around 9:40 a.m. on December 28, 2007, at a beauty salon on Springfield Avenue in Newark, where Gloria Reed and Keisha Munroe were patrons and Mary Luz Hernandez worked as a beautician. According to the State's proofs, Munroe saw a man, later identified by all three women as defendant, enter the salon and tap Hernandez twice. When Hernandez ignored him, defendant sat down next to Munroe and attempted to grab her purse. Munroe moved the purse before he could take it, and asked what he wanted. At that time, she saw a gun with a "skinny barrel" in his hand. Defendant demanded her "stuff," got up from the chair, and told Munroe that he also wanted her rings as he walked towards Hernandez. Munroe gave him ninety dollars and her engagement ring set.
Reed, who had fallen asleep, was awakened by Hernandez's voice saying "what do you want?" She saw defendant standing by Hernandez. Reed heard him tell Hernandez, "I'm not playin," and "take the fuckin' rings off." Both Reed and Hernandez saw him pull from a bag a black revolver with a long barrel. Hernandez took off her engagement ring, and gave it to him. Defendant then pointed the gun at Reed's face, and demanded money. When Reed replied that she did not carry money, he told her to take off her engagement ring and give it to him, which she did.
After he took their money and jewelry, defendant ordered the women at gunpoint to walk to the back of the salon. When Reed refused, he walked out. By Munroe's estimate, the entire incident lasted between five and ten minutes. All three victims got a good look at the robber as the salon was well lit.
After defendant left, Reed got into her car, which was parked directly in front of the salon, and chased him about eight blocks to Tenth Street, while Munroe called the Newark Police Department (Newark PD). At some point, defendant turned around and looked directly at Reed before running into a cemetery. Reed lost sight of him, and when she returned to the salon, the police were there. She told a police officer about the chase, and he drove her back to the cemetery but they did not find the suspect.
At 10:15 a.m., Detective Gerardo Rodriguez and Sergeant Lee Douglas of the *1238 Newark PD responded to a call of a robbery at the beauty salon. While Rodriguez briefly investigated the scene, the three victims were transported separately to police headquarters, where they continued to be separated.
Rodriguez first took Munroe to a small room with a computer containing a database of photographs of individuals previously arrested in Essex County. The database was part of the High Intensity Drug-Trafficking Area (HIDA) system. Rodriguez was trained on "[h]ow to set up the parameters, how to switch from six photos to six other photos, [and] how to set up photo displays," but was not trained on how to save a search.
To set up the computer-based photo retrieval system, Rodriguez first asked Munroe for a description of the suspect. Munroe described the robber as a "light-brown-skinned black male," with gold teeth and a goatee, who was wearing a black flight jacket, black jeans and a black skull cap. Rodriguez entered the information into the computer, "light-skinned black males with goatee," explaining there were no parameters for clothes or teeth. He did not write down the description, explaining there was no pre-identification procedure to memorialize it.[1]
Rodriguez then directed Munroe to sit in front of the computer, and told her to take her time viewing the photographs. He explained that the screen would display six photographs at a time, and showed her "how to go forward to get six more." He asked her to alert him or the sergeant if she saw someone who resembled the suspect. He then returned to his desk, which was located at least twenty feet away, and took Hernandez's statement.
Munroe remained at the computer by herself, where no one disturbed her. After about fifteen to twenty minutes, and viewing over 300 photographs, she recognized defendant as the individual involved in the robbery, and alerted the sergeant, who notified Rodriguez. When Rodriguez asked if she was certain of her identification, Munroe replied yes, "one hundred percent." He then printed the photograph and Munroe signed and dated it.
After Munroe completed her identification, she came to Rodriguez's desk and Hernandez moved to the computer. The women did not speak to each other as they exchanged seats. Hernandez described the suspect as a black male with a thin build, a goatee, and front gold teeth, who was wearing all black clothing and a black skull cap. Rodriguez entered this description into the computer as Hernandez stood by him. He gave her the same instructions, telling her to take her time viewing the photographs and to let him or the sergeant know if she recognized the suspect. He explained that she did not have to pick someone. Afterwards, he returned to his desk and took Munroe's statement. Hernandez remained at the computer by herself, and notified the sergeant when she identified the suspect. He printed the photograph of defendant, and she signed and dated it. She subsequently gave Rodriguez a second statement.[2]
*1239 Douglas's first contact with Reed took place at the police station, when he took her statement. She reported seeing the suspect begging for quarters on Hawthorne Avenue prior to the robbery. She described him as five foot, eight or nine inches tall, skinny, light-brown dry skin, dirty hands, and gold teeth. Douglas input the information, except for the description of the suspect's clothing. He did not record the description, except in Reed's statement. Afterwards, he directed her to sit in front of the computer, to click the mouse to move forward or backward between screens, and to notify him if she saw a picture of the suspect. He then returned to his desk about seven feet away. After she identified defendant, she alerted Douglas, who printed the photograph and had her sign and date it.[3]
Reed was "100 percent sure" of her photographic identification. She explained: "I'm the one who seen him on top of me with that gun in my face and I never had a gun in my face ever in my life." She also identified defendant in court as the man who had robbed her.
After Reed gave her statement, she retrieved a "messed-up" photograph of defendant that someone had thrown away, and put it in her pocketbook. The photograph had his address on it. Although she did not know defendant, she thought he looked vaguely familiar. At some point after returning home, she decided that the "Newark Police not gonna do their job. So I'm gonna do it." She drove to defendant's house, parked in front, and waited. After a while, she drove to the corner and showed someone the photograph. After being told she was in the right area, Reed parked her car and waited about forty-five minutes to an hour until defendant arrived home. When he went into the house, she called the police.
At 5:00 p.m. on December 28, 2007, Rodriguez went to defendant's home with an arrest warrant after being notified by his sergeant that one of the victims had observed the person who committed the robberies. When he arrived, he met Douglas, who told him the suspect was inside the house. Reed was waiting when the officers arrived.
Douglas knocked on the front door and identified himself as a police officer. He saw defendant "peek out, [and] go back in, and out of sight." After "a long time," Herman Joseph opened the door and identified himself as defendant's father. When Douglas told him about the arrest warrant, the father allowed the officers to enter and search his house. They found defendant hiding in the attic and arrested him. Defendant was handcuffed and taken outside where a detective asked Reed to identify him, which she did. According to Reed, defendant's father asked if his son did "this" to her, and she said yes and walked away.
Testifying on behalf of defendant, Herman said that he and his son owned a limousine and messenger service and that on the day of the robberies, he had returned home from a job at JFK airport between 7:30 and 8:00 a.m., where he spoke with his son around 8:30 or 9:00 a.m. Around that time, one of Herman's friends, Clarence Walker, stopped by, and let defendant drive his new car around the *1240 block. Afterwards, the three men went inside the house. Walker confirmed that when he left Herman's house at 9:55 a.m., defendant was still there. According to Herman, his son left the house between 10:15 a.m. and 10:30 a.m. to go to the car wash.
That evening, after the officers had searched his house and were leaving with his son, Herman noticed a lady with rollers in her hair walking across the street. When he asked her why she had falsely accused his son, she replied, "[O]h, that's not the one." When asked why he did not go to the Newark PD to give his version of events, he replied that he told the detective at his house that the police had the "wrong guy" but that they were so busy looking for his son they did not let him say anything. He also did not believe it was necessary, explaining: "When the police lock you up, they got [their] mind made up anyway." Herman maintained, however, that his son did not commit the armed robbery, explaining: "We in a business. Why would [defendant] have to go and rob"?
Defendant did not testify. At the request of defense counsel, however, he stood and opened his mouth for the jury to see his teeth. At summation, defense counsel commented that defendant did not have any gold teeth. Evidently crediting the State's account, the jury found defendant guilty of the three armed robberies and related weapons offenses.

I
On appeal, as at trial, one of the principal issues concerns the victims' out-of-court identifications. Below, defendant challenged their admissibility at a Wade[4] hearing, during which the same evidence was adduced as at the later trial, and as recounted earlier in this opinion. At the conclusion of the Wade hearing, the court denied defendant's motion to suppress, finding that, under the totality of circumstances, the photo retrieval system was neither scientifically unreliable, impermissibly suggestive nor invalidated by police failure to record and retain the photographs viewed by the witnesses. On appeal, defendant launches the same multi-faceted attack, arguing:
A. THE DEFENDANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE STATE'S FAILURE TO LAY A PROPER FOUNDATION SHOWING THAT THE "PHOTO RETRIEVAL" DEVICE IS SCIENTIFICALLY RELIABLE AND ITS OPERATOR WAS SUITABLY QUALIFIED.
B. THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE STATE'S FAILURE TO RECORD AND DOCUMENT THE OUT-OF-COURT IDENTIFICATION EVIDENCE AND PROCEDURE.
C. THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE ADMISSION OF UNDULY SUGGESTIVE *1241 IDENTIFICATION EVIDENCE.

A.
We reject the contention the State had to establish the scientific reliability of the photo retrieval system used to obtain the out-of-court identifications in this case or prove its operation by expert testimony. As to the former, the system is not newly devised or novel technology heretofore untested and unscrutinized. State v. Harvey, 151 N.J. 117, 167-68, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). Indeed, courts routinely accept the use of computerized photographic databases. State v. Janowski, 375 N.J.Super. 1, 866 A.2d 229 (App.Div.2005). As to the latter, a judgment about the system may be made without the need for expert testimony.
N.J.R.E. 702 governs the admission of expert testimony. This rule provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." This rule has three requirements:
(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
[State v. Jenewicz, 193 N.J. 440, 454, 940 A.2d 269 (2008).]
Here, the State established through the testimony of Rodriguez and Douglas how the photo retrieval system operated, how they entered identifiers into the system, what descriptions they received from the victims, and what identifiers they input into the system for each victim. Because a computer system with large numbers of randomly selected photographs used for investigative purposes is essentially a mug shot book, Janowski, supra, 375 N.J.Super. at 8-9, 866 A.2d 229, the subject matter was not beyond the ken of an average juror, and expert testimony was not required to establish its reliability. See State v. Kelly, 97 N.J. 178, 209, 478 A.2d 364 (1984) (noting "[t]he primary justification for permitting expert testimony is that the average juror is relatively helpless in dealing with a subject that is not a matter of common knowledge"); State v. Doriguzzi, 334 N.J.Super. 530, 538, 760 A.2d 336 (App.Div.2000) ("A factfinder should not be allowed to speculate without the assistance of expert testimony in an area where the average person could not be expected to have sufficient knowledge or experience.").
In any event, there is no evidence to support defendant's claim that the photo retrieval system is unreliable. On the contrary, Rodriguez explained that after he entered a description into the computer database, "it would set up photos with people similar to the description given." Douglas testified that the photo retrieval system was not difficult, and that he had entered identifiers thousands of times. Moreover, defendant had ample opportunity to cross-examine both officers on the photo retrieval system and their qualifications to operate it.
Nevertheless, defendant argues that the court erred by admitting the photographs because the photo retrieval system lacked a proper foundation. N.J.R.E. 801(e) defines a photograph as a "writing." To be admissible, a writing must be authenticated. State v. Mays, 321 N.J.Super. 619, 628, 729 A.2d 1074 (App.Div.), certif. denied, 162 N.J. 132, 741 A.2d 99 (1999). Under N.J.R.E. 901, "[t]he requirement of authentication or identification *1242 as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." This rule "does not require absolute certainty or conclusive proof. The proponent of the evidence is only required to make a prima facie showing of authenticity." Mays, supra, 321 N.J.Super. at 628, 729 A.2d 1074. After making a prima facie showing, the writing is admissible and the jury decides the ultimate question of authenticity. Ibid. "A party introducing tangible evidence has the burden of laying a proper foundation for its admission." State v. Brunson, 132 N.J. 377, 393, 625 A.2d 1085 (1993).
The authentication of photographic evidence requires a witness to verify that it accurately reflects its subject, and to identify or state what the photograph shows. State v. Wilson, 135 N.J. 4, 14, 637 A.2d 1237 (1994). Any person with knowledge of the facts represented in the photograph may authenticate it. Ibid. To authenticate a photograph, a witness's testimony must establish that:
(1) the photograph is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph.
[Id. at 15, 637 A.2d 1237 (citation omitted).]
A trial court decides the preliminary question of whether a photograph is sufficiently accurate to justify its admission. Ibid.
The State satisfied these elements. The prosecutor showed the photographs retrieved from the computer to Rodriguez, who testified that: the photographs accurately represented the man whom Munroe and Hernandez identified as the perpetrator of the robbery on the date in question; he printed the front and side views of the photographs; at his request, each victim signed and dated the backs of the photographs she selected; and defendant was the man identified by each of them. Douglas similarly testified that the photograph shown to him at trial was the one Reed selected from the photo retrieval system, that he printed two views of the photographs, that Reed signed and dated the backs of them, and that the man in the photographs was defendant. These photographs were admitted without objections.
Reed and Munroe also authenticated the photographs by testifying that they depicted the man who had robbed them, that they had selected the photographs from the computerized database, that they had signed and dated the backs of them, and that defendant was the man represented in the photographs. Likewise, Hernandez recalled looking at photographs on the computer, and verified her signature on the backs of two printed copies even though she did not remember signing them. Thus, the photographs were properly authenticated and made available to the jury.

B.
Defendant next contends his due process rights were violated by a procedure that failed to record the out-of-court identifications and preserve the photographic array. He complains that the witnesses could have gone back and reviewed photographs a second time, and the system could have included more than one photograph of defendant.
In State v. Delgado, 188 N.J. 48, 58, 902 A.2d 888 (2006), the Court addressed the issue of whether the police had a duty to record the details of out-of-court identification procedures. It found no constitutional violation, and concluded that the trial court properly admitted the photographic identifications. Id. at 58-68, 902 A.2d 888. *1243 Specifically, it held that the failure to make a detailed record of the out-of-court identification procedure did not deny the defendant a fair trial because there was full disclosure before his trial through such sources as police reports and Wade testimony. Ibid. The Court, however, exercised its supervisory powers under Article VI, Section 2, Paragraph 3 of the New Jersey Constitution "to require that, as a condition of the admissibility of an out-of-court identification, law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results." Id. at 63, 902 A.2d 888. It explained that a verbatim account of any exchange between the police and a witness should be reduced to a writing and, if not feasible, a detailed summary of the identification should be prepared. Ibid.; see also State v. Earle, 60 N.J. 550, 552, 292 A.2d 2 (1972) ("[E]nforcement authorities should . . . make a complete record of an identification procedure if it is feasible to do so, to the end that the event may be reconstructed in the testimony.").
Generally, when a photographic identification is made or attempted, the photographs shown to the witness should be recorded. Earle, supra, 60 N.J. at 552, 292 A.2d 2; Janowski, supra, 375 N.J.Super. at 6, 866 A.2d 229. A photographic array is constructed by the police, and typically contains a small number of photographs that the officer personally presents to a witness to confirm or eliminate suspects. Janowski, supra, 375 N.J.Super. at 7-8, 866 A.2d 229. When the police prepare these arrays, they typically have someone in mind. Id. at 7, 866 A.2d 229.
"While photographic arrays must be preserved to be admissible, the use of mug shot books to develop an as-yet-to-be-determined suspect does not require that all the photographs viewed in the mug shot books be preserved." Id. at 6, 866 A.2d 229 (citing State v. Ruffin, 371 N.J.Super. 371, 395, 853 A.2d 311 (App. Div.2004)). As explained in Janowski, mug shot books contain large numbers of randomly selected photographs that are already assembled and kept for the purpose of investigation, not confirmation, and are a resource "`shown to witnesses as a matter of course to see if a suspect [can] be found.'" Id. at 6-8, 866 A.2d 229 (quoting Ruffin, supra, 371 N.J.Super. at 395, 853 A.2d 311) (alteration in original). The failure of law enforcement officers to preserve these photographs does not require suppression of a victim's out-of-court identification, where there is no evidence that they acted in bad faith. Id. at 8-9, 866 A.2d 229; Ruffin, supra, 371 N.J.Super. at 397-98, 853 A.2d 311 (holding failure to preserve books of photographs used in pretrial identification procedure did not require suppression of out-of-court identification, where record did not establish that the books were destroyed or withheld in bad faith or with the intent to subvert the defendant's rights).
Likewise, a collection on a computer of large numbers of randomly selected photographs, which are kept for the purpose of investigation and shown to witnesses as a matter of course to see if a suspect can be found, is essentially a mug shot book. Janowski, supra, 375 N.J.Super. at 6-9, 866 A.2d 229 (holding photographs from large computerized database shown to victim before police created a small photo array were the equivalent of a mug shot book, which need not be preserved). Thus, the failure to retain all photographs in a computer system viewed by a victim is not fatal to the admission of an out-of-court identification. Id. at 9, 866 A.2d 229.
*1244 Moreover, even if photographs viewed by the victim on a computer are construed as an array, the failure to retain them "does not automatically result in the suppression of an out-of-court identification." Ibid. "Instead, such an omission, if not explained, should be weighed in deciding upon the probative value of the identification." Ibid. (citing Earle, supra, 60 N.J. at 552, 292 A.2d 2).
Here, the victims were shown a large, albeit unknown, number of photographs as part of the investigation to find the suspect. Although the officers did not document the procedure or save the computer search, there is no evidence that either officer acted in bad faith. The record also does not indicate that any of the victims were pressured into selecting a photograph of defendant or anyone else. To the contrary, at the Wade hearing Douglas testified that he never saw defendant prior to this incident, and Rodriguez indicated that he did not know anything about defendant except that the inclusion of his photograph in HIDA meant that he had a prior arrest. Both officers described the same identification procedure, and stated that they left the victims alone to view the computerized images while they returned to their desks. The three victims independently selected photographs of defendant, and reported their findings to the sergeant. Moreover, defendant was not denied a fair trial by the lack of a detailed record of the out-of-court identification procedure because he knew about the identifications before trial, and had the opportunity to fully explore the identification procedure during questioning of Rodriguez and Douglas at the Wade hearing.

C.
In the third prong of his attack, defendant argues that the out-of-court identifications were impermissibly suggestive. We disagree.
It is well-established that an out-of-court identification procedure that was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates due process. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968); State v. Herrera, 187 N.J. 493, 502, 902 A.2d 177 (2006). To determine the admissibility of eyewitness identifications, New Jersey courts adopted the two-prong test articulated by the Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). Herrera, supra, 187 N.J. at 504, 902 A.2d 177; State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988); State v. Cook, 330 N.J.Super. 395, 417, 750 A.2d 91 (App.Div.), certif. denied, 165 N.J. 486, 758 A.2d 646 (2000).[5] Under the Manson/Madison test, a court must first determine whether the identification procedure used by the State was impermissibly suggestive. Madison, supra, 109 N.J. at 232, 536 A.2d 254; State v. Adams, 194 N.J. 186, 203, 943 A.2d 851 (2008). This prong asks "`whether the choice made by the witness represents his [or her]own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer.'" Adams, supra, 194 N.J. at 203, 943 A.2d 851 (quoting State v. Farrow, 61 N.J. 434, 451, 294 A.2d 873 (1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973)). If yes, the court must decide "`whether the impermissibly *1245 suggestive procedure was nevertheless reliable by considering the totality of the circumstances and weighing the suggestive nature of the identification against the reliability of the identification.'" Id. at 203, 943 A.2d 851 (quoting State v. Romero, 191 N.J. 59, 76, 922 A.2d 693 (2007)).
To determine reliability, a court must consider:
[T]he opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
[Manson, supra, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.]
See Adams, supra, 194 N.J. at 204-06, 943 A.2d 851 (holding out-of-court procedures were suggestive but reliable, because all witnesses had the opportunity to view the defendants during the robbery, no defendant wore a mask, the lighting was good or adequate, the witnesses paid attention, and the photographic identifications were conducted within two days of the incident).
Here, the three victims arrived separately at the police station, and did not speak to each other throughout the identification process. Rodriguez and Douglas gave them the same instructions. The officers did not discuss any details of the robbery or question the witnesses about the suspect prior to the identifications. At the time, they did not know the identity of the perpetrator, and were unaware of defendant. They entered into the computer only the information given to them. Each victim viewed the computerized display alone and uninterrupted, and there is no suggestion that either officer did anything to lead them to select a certain photograph. The officers told the victims simply to view the photographs and let the sergeant know if they recognized the suspect. Although there was some conflicting testimony at trial between Rodriguez and Hernandez about the number of photographs viewed, there is nothing in the record to suggest that Rodriguez pressured Hernandez to continue looking for photographs of defendant. Because neither Rodriguez nor Douglas made any attempt to influence the victims to choose defendant's photograph, there is no evidence to support the claim that the out-of-court identifications were impermissibly suggestive.
Moreover, the out-of-court identifications were reliable. All three victims had the opportunity to view defendant during the robbery, and testified that they got a good look at him. Defendant was not wearing a mask, and the salon was well lit. All three witnesses gave similar descriptions of the suspect to Rodriguez and Douglas as reflected in their statements.[6] Moreover, the photographic identifications were made within hours of the incident.

II
Defendant also takes issue, for the first time, with the lack of a cross-racial identification charge because Hernandez is Hispanic and he is African-American. There is no merit to this argument.
At the close of the jury charge, the court stated outside the jury's presence that it had considered the possibility of an instruction *1246 on cross-racial identification but decided against it because there was no cross-racial issue, explaining that there were two African American victims, and one Hispanic of color, "not a white Hispanic." Counsel did not object or request a cross-racial identification charge.
Because defendant did not object to the jury instructions at trial, the plain error standard applies. R. 2:10-2; see also State v. Burns, 192 N.J. 312, 341, 929 A.2d 1041 (2007). "In the context of a jury charge, plain error requires demonstration of `[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Burns, supra, 192 N.J. at 341, 929 A.2d 1041 (quoting State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997)).
"A cross-racial identification occurs when an eyewitness is asked to identify a person of another race." State v. Cromedy, 158 N.J. 112, 120, 727 A.2d 457 (1999). A court should give a cross-racial jury instruction only when "identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." Id. at 116, 132, 727 A.2d 457 (holding reversible error not to give cross-racial instruction where identification by white female sexual assault victim of the African-American male defendant was critical, and was not corroborated by any forensic evidence or other eyewitness account); cf. State v. Harris, 357 N.J.Super. 532, 538, 816 A.2d 171 (App.Div.2003) (affirming court's denial of application for cross-racial instruction where identification of the black defendant by a white witness was corroborated by another witness who was also black).
The cross-racial instruction requires jurors to consider "`[t]he fact that an identifying witness is not of the same race as . . . defendant, and whether that fact might have had an impact on the accuracy of the witness's original perception, and/or the accuracy of the subsequent identification.'" State v. Walker, 417 N.J.Super. 154, 159, 8 A.3d 844 (App.Div. 2010) (quoting Model Jury Charge (Criminal), "Identification: In-Court and Out-of-Court Identifications" (2007)). It also requires jurors to "`consider that in ordinary human experience, people may have greater difficulty in accurately identifying members of a difference race.'" Ibid.
Our courts recognize that the term "Hispanic" does not describe a race, but rather is a cultural term, an ethnic identification. Romero, supra, 191 N.J. at 68, 922 A.2d 693; State v. Valentine, 345 N.J.Super. 490, 496, 785 A.2d 940 (App.Div.2001), certif. denied, 171 N.J. 338, 793 A.2d 716 (2002). As explained in Valentine, "Hispanics are of different races, i.e. African-American, Caucasian, Native-American, or Asian." Valentine, supra, 345 N.J.Super. at 497, 785 A.2d 940. Our courts do not require a cross-racial identification charge tailored to ethnicity. Romero, supra, 191 N.J. at 66, 72, 922 A.2d 693 (holding cross-racial charge was not warranted in robbery prosecution where the defendant was Hispanic Caucasian and the witness-victim was non-Hispanic Caucasian); Valentine, supra, 345 N.J.Super. at 496-97, 785 A.2d 940 (holding Cromedy did not require a "cross-ethnic" jury instruction). In some instances, however, a cross-racial charge may be warranted as between Hispanics and African-Americans. State v. Walton, 368 N.J.Super. 298, 305-06, 845 A.2d 1257 (App.Div.2004) (holding court's decision not to give the requested Cromedy instruction was prejudicial error, where witness and the defendant were of different *1247 races and ethnicities, and the robber's identity was a central issue).
Here, the court concluded that Hernandez was a Hispanic of color, and defendant did not dispute this conclusion at trial and does not challenge this finding on appeal. Because the record does not establish that defendant and Hernandez were of different races, a cross-racial identification charge was not required.
Moreover, although identification was an important issue in the case, there was independent corroboration of Hernandez's identification of defendant. Both Munroe and Reed, who, like defendant, were African-American, identified him out-of-court and in-court as the man who committed the robberies. As noted, they observed defendant in the well-lit salon, and Reed also followed him afterwards. All three victims gave similar descriptions of defendant to law enforcement officers and made their out-of-court identifications on the same day as the robberies.
Additionally, the court instructed the jury on the proper use of out-of-court and in-court identifications. These instructions included the following language required by the Romero Court in out-of-court identification charges:
"Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification."
[Romero, supra, 191 N.J. at 75-76, 922 A.2d 693 (quoting Model Jury Charge (Criminal), Identification: Out-Of-Court Identification (2007)).]
Under the circumstances, we find no error in the lack of a cross-racial identification charge.

III
Defendant's last identification-related challenge concerns the preclusion of his so-called expert from testifying about the photo retrieval system. This argument also lacks merit.
In granting the State's motion to bar defense expert's testimony, the court found no evidence to suggest defendant's expert had "any experience, other than his opinion," with the particular photo retrieval system viewed by the victims, and noted that he had not previously testified as an expert in this particular area. Noting, further, that it was inappropriate for an expert to testify about the accuracy of identifications, the court ruled that jurors should use a common sense approach to understanding this evidence.
We have already determined that expert testimony was not necessary to establish the reliability of the procedure employed in this case. Regardless, defendant fails to offer any specific legal authority in support of his argument or to provide facts of record to refute the court's finding that his expert was not qualified to testify about the particular identification procedure used. As such, there was no error in barring the defense expert's testimony.
[At the direction of the court, per R. 1:36-2(a), the discussion of other issues in this appeal has been omitted from the published version of the opinion.]
The matter is remanded for resentencing to reflect the appropriate merger and unmerger of offenses and to amend the judgment of conviction in accordance with this opinion. The judgment of conviction is affirmed in all other respects.
NOTES
[1] Rodriguez did not know how many photographs the HIDA system retrieved after he entered descriptive terms called "identifiers." He also did not know whether defendant had been previously arrested, except for the fact that his photograph was in the system.

Rodriguez was not required to keep a separate written record of identifiers entered into the computer, but explained that descriptions given to him by the victims were recorded in their statements. He also was not required to watch the victims as they viewed the photographs, or keep track of how many times they went back and forth between pictures.
[2] At trial, Hernandez was unable to make an in-court identification of defendant.
[3] Like Rodriguez, Douglas did not make a written record of the identifiers he entered in the computer because he was not required to write them down except as part of the victim's statement. Nor did he document the time when Reed started or finished the identification process, or how many photographs she viewed. He also did not record how many times she observed a photograph or moved between screens, or watch her as she sat at the computer. When asked if he had received any training in the use of the photo retrieval system, he replied no. Douglas had never seen defendant prior to this incident.
[4] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[5] In State v. Henderson, 208 N.J. 208, 285-293, 27 A.3d 872 (2011), the Court revised the Manson/Madison test for evaluating eyewitness identification evidence in criminal cases. The new rule of law, however, applies to future cases only. Id. at 300-02, 27 A.3d 872. Because the court below decided this matter in 2009, the Henderson rule does not apply.
[6] While defendant contends that Munroe described the assailant as light-skinned and Hernandez said he was dark, the record actually reflects that Hernandez described the suspect as a "thin black male." Reed also described the suspect as having "light brown skin."