**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0359-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ALBERTO PENA, a/k/a
ALBERTO P. MARTINEZ,
and MARTINEZ MARTINEZ,

    Defendant-Appellant.

_____

> Argued April 7, 2025 – Decided July 24, 2025
>
> Before Judges Gummer, Jacobs and Jablonski.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 19-10-2948.
>
> Robert C. Pierce argued the cause for appellant (Jeff E. Thakker, of counsel; Robert C. Pierce, on the briefs).
>
> Hannah F. Kurt, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Hannah F. Kurt, of counsel and on the brief).

John J. Santoliquido, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; John J. Santoliquido, of counsel and on the brief).

Tamar Y. Lerer, Deputy Public Defender, argued the cause for amicus curiae New Jersey Office of the Public Defender (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the brief).

PER CURIAM

Defendant Alberto Pena appeals from his convictions for assault and weapons offenses following a jury trial. He seeks dismissal of the indictment and reversal of the judgment of conviction, or, in the alternative, a new trial. He argues various evidentiary rulings regarding the State's presentation of surveillance video were incorrect, evidentially infirm witness statements were admitted, and the prosecutor made improper comments during his closing argument. Defendant argues he was deprived of a fair trial. We disagree and affirm.

I.

In July 2019, Newark Police officers responded to a report of a shooting in front of a bodega and an adjacent barbershop. When they arrived, the officers observed a blood-splatter trail and recovered an empty shell casing on the

sidewalk approximately twenty-five feet from at trail. The victim of the shooting, later identified as Andres Sosa, suffered a gunshot wound to his chin.

The police discovered security cameras installed at the bodega and at the barbershop captured a portion of the incident. Although the footage did not include the actual shooting, it depicted an altercation between two individuals both before and after the shooting. The video shows the person officers believed was the suspect working behind the bodega's counter wearing a white t-shirt and black shorts and having both a ponytail and a tattoo of red lips on his neck. The victim entered the bodega and talked to the suspect. When he left, the suspect followed him outside. A quarrel ensued, and the suspect is then seen drawing and pointing a handgun at the victim. After the parties stepped outside the camera's view briefly, the victim reappeared clutching his face. This evidence, combined with information from additional witness interviews the police had conducted, ultimately led to defendant's identification and arrest.

A grand jury indicted defendant and charged him with first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1) and (2); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a).

3

At defendant's jury trial, the State called members of the Newark Police Department to testify, including Technical Service Unit Officer Alton Faltz and Major Crimes Shooting Response Team Lead Detective Shaheed Brown. Neither the victim nor the owners or employees of the bodega or barbershop appeared.

As part of his investigation, Detective Brown photographed the victim's significant facial injuries and interviewed multiple witnesses, including the bodega owner and the victim, before identifying and arresting defendant.

Before Detective Brown testified at trial, the prosecutor informed the judge and defense counsel:

> I am going to be asking Detective Brown whether he took statements. I understand I can't ask him what those statements are. I understand that's hearsay. But just so the record, to everyone it [sic] is clear, I am going to be asking that he took statements as part of his investigation in this case and who those statements were from.

Defense counsel objected:

> Judge, I guess I would object to it because we are not going to be talking about why they are not here. So, that's kind of opening a door a little bit on where were the people that gave the statements.

In response, the judge asked the prosecutor to explain his intended approach with Detective Brown. The prosecutor responded:

A-0359-23

At a minimum . . . I was planning on naming the victim . . . . He has already been named in openings, has been named by other witnesses already here before the jury. At a minimum I am going to be naming him in part that I have photographs which [defense counsel] has that my lead detective took of the victim on the date of his statement which shows injuries to his face . . . .

Acknowledging "identification is ultimately a question for the jury, whether you have witnesses doing the identifying or whether there is . . . circumstantial evidence that permits a jury to conclude beyond a reasonable doubt that the defendant is the person depicted in the video," the judge permitted that "limited questioning."

Detective Brown testified he had interviewed multiple witnesses, including the bodega owner and the victim before arresting defendant:

Q. [Detective] Brown, now, based on your investigation and following your interview with [the victim], what did you do next?

A. I attempted to look for the suspect.

Q. And did you identify who that suspect was?

A. Yes.

Q. Who was it?

A. [Defendant].

. . . .

5

Q. When you say you looked for [defendant], did you do anything official as far as looking?

A. Yes, I took a few statements from witnesses. The store owner –

. . . .

Q. Did you eventually file charges against [defendant]?

A. Yes.

Q. And that was again after your investigation, after your interview with [the victim], correct?

A. Yes.

Following this exchange, the prosecutor published defendant's arrest photo to the jury.

The State also called Officer Faltz to testify about the video footage he had downloaded from the bodega and barbershop security cameras that showed the interaction between defendant and the victim. Defense counsel objected to Officer Faltz's testimony, arguing he lacked personal knowledge or ownership of the video, and therefore could not authenticate it.

The State disagreed and proffered Officer Faltz

works for the City of Newark, at his regular assignment he responds to scenes to recover surveillance videos, on the date he responded to that, on that same date, a short

6

time after the incident was processed and closed off, he received consent from the owner of the store. He then downloaded that video. He was told to download a specific time, time frame. <u>He reviewed it at the time he was downloading it</u>, [he] and I have reviewed it in preparation for his trial today, and his testimony . . . . [H]e can authenticate the location. He can authenticate that it's, in all candor[,] it's going to be the supermarket. <u>He can authenticate the supermarket, inside, the outside, that it does fairly and accurately depict what it looked like and what he downloaded on that date</u> . . . .

[(Emphasis added).]

The trial court found Officer Faltz's role in downloading and reviewing the video shortly after the event was sufficient to permit him to authenticate the recording and to satisfy the evidentiary prerequisite for the surveillance to be admitted:

Rule 901 covers authentication and identification. It reads in its entirety, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must [present] evidence sufficient to support a finding that the item is what its proponent claims." That is all that the rule requires . . . .

In general, there is, with the advent of the video, something that has been known now in shorthand . . . as the silent witness. The authentication of a film which purports to portray an actual criminal event taking place would not require the same type of authentication . . . . That's State v. Bunting, [187 N.J. Super. 506, 509 (App. Div. 1983)] . . . .

A-0359-23

> Film evidence, which is introduced as independent evidence of the crime[,] should be admitted without corroborative testimony by an eyewitness if the film is otherwise authenticated.
>
> Under the facts and circumstances proffered here, I am satisfied that the detective's response to the location and the obtaining of consent, as well as the review and downloading of the video in close proximity to the events that it purports to depict is adequate authentication for admissibility purposes. The video comes in.

Officer Faltz testified he had been dispatched to the crime scene to assist investigating officers who were experiencing difficulty in downloading the video surveillance. After the supermarket's owner consented, Officer Faltz successfully retrieved and downloaded the video and noted he neither modified nor altered the recording.

> [Q.] [W]hen you responded to the scene, did you review the videos at the scene?
>
> A.  Maybe.
>
> Q.  Before downloading?
>
> A.  Before downloading?  No.
>
> Q.  So, you do not – when you went to retrieve the videos, were you provided a specific timestamp to –
>
> A.  Correct.

A-0359-23

Q. And when you downloaded the video, did you check for any dates and time[s] to see if they were accurate?

A. Correct, yes.

Q. So, to do that you had to review the video, correct?

A. Correct, yes.

. . . .

Q. Okay. So, is it safe to say that you had to review the videos to get the accuracy of the date and time or lack thereafter?

A. Yes.

Q. So you reviewed the videos, correct?

A. Part of it, yes.

He also checked the accuracy of the date and timestamp embedded in the video and determined that the timestamp was inaccurate, specifically being approximately twelve hours off due to the surveillance system's use of military time:

Q. Could you describe what the inaccuracy was?

A. The time and the date.

. . . .

A-0359-23

Q.    And how much was it off by?

A.    I would say [by] approximately [twelve] hours.

Q.    And how did you know that?

A.    Because it was that afternoon and the actual system was in military time.

The trial judge admitted the footage and certain still images from it as evidence.

At the close of the State's case, defense counsel moved for a judgment of acquittal and argued the evidence was insufficient to establish defendant's guilt. Specifically, defense counsel emphasized the absence of a firearm, bullet, or medical documentation. The judge denied the motion and held:

> [I]f the jury were to determine beyond a reasonable doubt that . . . it is [defendant] on the video and that [defendant] used a handgun to shoot the victim in the face, they would be permitted to infer from those actions alone, that his intent was either to kill or to seriously injure.
>
> Further, . . . they could conclude beyond a reasonable doubt that he unlawfully possessed a handgun.

In closing arguments, defense counsel highlighted the lack of physical evidence and eyewitness testimony, challenged the identification of defendant, and criticized the overall thoroughness of the investigation. The State relied on surveillance video and police testimony, and argued that the handgun could not

A-0359-23

be recovered because the defendant was not apprehended immediately. The prosecutor also referred to the contact Detective Brown had with the victim and specifically noted the victim had provided a "statement" to him. The prosecutor did not provide any details about that statement to the jury. Additionally, addressing the lack of a weapon and the month-long interval between the shooting and defendant's arrest, the prosecutor commented

> Now, we don't have a handgun. As [Detective] Brown testified to, [defendant] was not arrested until almost a month later. [Defendant]'s actions are the reason why we don't have a handgun. [Defendant] was not arrested on the scene. [Defendant] fled the scene and eventually was not arrested until a month later. Plenty of time to get your gun, plenty of time to get a new haircut. Wasn't enough time, though, to get rid of his red lips tattoo on the side of his neck that is still here today.

During the deliberations, the jury asked to review specific portions of the surveillance video and also to examine "Detective Brown's report of the victim and statement." In answer to the second request, the judge told the jury:

> If you will recall from my instructions, I did indicate to you that even though items might have been marked for identification, unless they were actually received in evidence –
>
> . . . .
>
> . . . they cannot be provided to you. This is one of those items. It was marked for identification, but not

11

received into evidence. I therefore, cannot provide the report for you. I am instructing you as I instructed you earlier, that it is your recollection of the detective's testimony that controls. Of course, you always have the option, if you wish, to have us play back a portion of the detective's testimony . . . . But I can't give you the report.

The jury ultimately acquitted defendant of attempted murder and second-degree aggravated assault but convicted him of third-degree aggravated assault, unlawful possession of a handgun, and possession of a handgun for an unlawful purpose.

On September 8, 2023, the court sentenced defendant to a five-year prison term for the aggravated-assault conviction to be served concurrently with a six-year prison term with a forty-two-month parole ineligibility period under the Graves Act[1] for the firearm convictions.

Defendant on appeal raises five issues for our consideration:

POINT I

[DEFENDANT] WAS IDENTIFIED AS THE SHOOTER THROUGH HEARSAY AND AN IMPROPER INSINUATION ABOUT WHAT WAS IN DETECTIVE BROWN'S REPORT.

---

[1] The Graves Act requires a mandatory prison sentence including a period of parole ineligibility for an individual's conviction of certain firearm and weapons-related offenses. N.J.S.A. 2C:43-6(c).

POINT II

AT MINIMUM, THE TRIAL COURT
SHOULD HAVE ISSUED A LIMITING
INSTRUCTION REGARDING THE
OUT-OF-COURT STATEMENTS
IMPLICITLY IDENTIFYING
[DEFENDANT] AS THE SHOOTER.

POINT III

THE STATE FAILED TO PROPERLY
AUTHENTICATE THE
SURVEILLANCE VIDEO AND ITS
WITNESS WAS INCAPABLE OF
DOING SO; [THE VIDEO] AND THE
STILL SHOTS SHOULD NOT HAVE
BEEN ADMITTED.

POINT IV

THE TRIAL COURT SHOULD HAVE
GRANTED [DEFENDANT]'S MOTION
FOR A JUDGMENT OF ACQUITTAL.

POINT V

THE PROSECUTOR'S SUMMATION
WAS IMPROPER IN SEVERAL
RESPECTS.

II.

In sum, defendant contends that the prosecutor used inadmissible hearsay

to link him to the shooting, and also challenges the authentication of the

surveillance video on grounds that the officer who downloaded it had not

13

reviewed the entire recording. He also asserts the trial judge improperly denied his motion for acquittal, and the prosecutor's closing remarks were improper and undermined the fairness of his trial. We are not persuaded by these arguments.

A.

Defendant first argues Detective Brown improperly implied to the jury he had superior knowledge about defendant's identification as the shooter from witness interviews. He contends the detective's testimony about the identification was improper because the witnesses the Detective interviewed did not testify at trial.

We defer to a trial judge's evidentiary rulings and will disturb them only if the judge misapplied discretion. State v. Scharf, 225 N.J. 547, 572 (2016). We "will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" State v. Mauti, 448 N.J. Super. 275, 307 (App Div. 2017) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)). When, however, "the trial court fails to apply the proper legal standard in determining the admissibility of proffered evidence," we review the evidentiary ruling de novo. State v. Williams, 240 N.J. 225, 234 (2019).

Specifically, defendant argues Detective Brown's testimony that he "took a few statements from witnesses" and conducted an "interview with [the victim]"

communicated an inescapable inference that the witnesses identified defendant as the shooter. In opposition, the State contends these statements only described Detective Brown's investigative steps that were not central to the case and emphasizes that the primary evidence linking defendant to the crime was the surveillance video and related photographic evidence.

Police officers are permitted to describe their actions and observations based on first-hand knowledge. State v. Singh, 245 N.J. 1, 15 (2021). Importantly, this information may not be derived from hearsay, however. See State v. Branch, 182 N.J. 338, 350 (2005). Such testimony is admissible so long as it does not relay, expressly or by implication, information that the officer "'believed,' 'thought,' or 'suspected.'" State v. McLean, 205 N.J. 438, 460 (2011). Both the Confrontation Clause and the hearsay rule are implicated if an officer conveys, even by inference, evidence from a non-testifying declarant to incriminate the defendant. State v. Bankston, 63 N.J. 263, 269 (1973). For example, although officers may testify that they acted "upon information received" to explain the course of an investigation, it is improper for them to suggest or imply that such information specifically identified the defendant, which can lead the jury to infer the existence of incriminating out-of-court statements by non-testifying witnesses. Id. at 268-69.

A-0359-23

Here, Detective Brown testified only about the steps he had taken during his investigation, including the standard procedure of interviewing witnesses. His testimony referenced those interviews in a general manner, without relaying any specific details or the substance of the statements obtained. Accordingly, we discern no error in the trial court's decision to permit Detective Brown's testimony regarding the manner and method of his investigation.

B.

Next, defendant contends that following the admission of Detective Brown's testimony about his witness interviews, the trial court failed to instruct the jury that it should not speculate about the contents of any out-of-court statements nor infer the victim, the bodega owner, or any other witness had identified defendant as the shooter. Rather than providing this limiting instruction, the court directed the jury to rely solely on its own recollection of Detective Brown's testimony. Defendant argues this approach exacerbated the error because the court did not clarify the substance of any statements purportedly made by the victim or other witnesses. Defendant asserts the trial judge committed plain error that requires a reversal of his conviction. We disagree.

16

Because defendant did not raise this issue before the trial court, we review the trial judge's decision and approach for plain error. Singh, 245 N.J. at 13. "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). Therefore, "the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." Ibid. (quoting State v. R.K., 220 N.J. 444, 456 (2015)). A reviewing court should consider whether the absence of an instruction was harmful in the surrounding context of the trial itself. See State v. Garrison, 228 N.J. 182, 201 (2017).

Limiting instructions must be provided "when the evidence is first presented and again as part of the final jury charge" and must explain "precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." State v. Rose, 206 N.J. 141, 161 (2011) (quoting State v. Barden, 195 N.J. 375, 390 (2008)); see also N.J.R.E. 105.

Detective Brown's testimony was limited to the investigative steps he had taken following the shooting, and no substantive information regarding the

A-0359-23

content of the witness interviews was presented to the jury. The officers already had a description of the assailant based on video evidence, and the subsequent interviews merely confirmed the identity of the individual depicted as committing the crime. Detective Brown's testimony did not suggest that any unavailable witness had implicated defendant. Therefore, there was no evidentiary infirmity, and a limiting instruction was unnecessary.

C.

Defendant next argues the State failed to properly authenticate the footage of the incident recorded by the bodega's security camera, and therefore, the video should have been excluded from evidence. The Office of the Public Defender, appearing as amicus curiae, amplifies this argument by asserting that the video should not have been admitted into evidence because the State had not presented testimony from any witness who was actually present at the scene shown in the footage, nor from anyone with sufficient knowledge to confirm that the video accurately portrayed the claimed events, date, and time. In response, the State, joined by the Office of the Attorney General, also appearing as amicus, maintains the video was properly admitted as independent evidence of a crime and, as such, did not require corroborative testimony. See Bunting, 187 N.J. Super. at 509-10.

A-0359-23

We review evidentiary rulings concerning authentication deferentially and will uphold them unless a trial judge's decision represents a clear error of judgment. State v. Brown, 463 N.J. Super. 33, 51 (App. Div. 2020). Our Supreme Court has long recognized "the authentication requirement of a videotape is a direct offshoot of the authentication of photographic and motion picture evidence." State v. Wilson, 135 N.J. 4, 16 (1994). Videos are admissible if properly authenticated. Id. at 17. Proper authentication as a condition precedent to admissibility is met by "evidence sufficient to support a finding that the matter is what its proponent claims." N.J.R.E. 901. The proponent must demonstrate "a prima facie showing of authenticity," which can be established by direct or circumstantial proof at trial. State v. Joseph, 426 N.J. Super. 204, 220 (App. Div. 2012). Although important, "[t]his burden was not designed to be onerous." State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016). "The authentication rule 'does not require absolute certainty [nor] conclusive proof.'" Brown, 463 N.J. Super. at 51-52 (quoting State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999)). "Once a prima facie showing is made, the [evidence] is admissible, and the ultimate question of authenticity of the evidence is left to the jury." Mays, 321 N.J. Super at 628 (italicization omitted). "'Courts are inclined to assess their role in authentication as that of a screening process[,]'

and 'will admit as genuine writings which have been proved prima facie genuine . . . leaving to the jury more intense review of the documents.'" Konop v. Rosen, 425 N.J. Super. 391, 411 (App. Div. 2012) (alteration in original) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 901 (2011)).

To authenticate video evidence, "a witness must identify the persons, places, or things shown in the . . . videotape." Wilson, 135 N.J. at 14. "[A]ny person with the requisite knowledge of the facts represented in the . . . videotape may authenticate it," irrespective of whether the authenticator was present at the time the video was taken. Ibid. "[S]o long as the witness can verify" that the video evidence "accurately represents its subject," they may authenticate it. Ibid. The authenticator's testimony "must establish that the videotape is an accurate reproduction of that which it purports to represent and the reproduction is of the scene at the time the incident took place." State v. Loftin, 287 N.J. Super. 76, 98 (App. Div. 1996).

The trial judge properly determined the surveillance video was authenticated and appropriately exercised his discretion in admitting the footage as evidence. The State presented testimony from Officer Faltz who personally retrieved and downloaded the surveillance footage from the premises shortly

A-0359-23

after the incident, reviewed its contents, and confirmed that it accurately depicted the events without alteration. Although minor discrepancies were noted with respect to the timestamp and we acknowledge the officer reviewed only portions of the footage, there was no allegation nor evidence presented of tampering or substitution. Similarly, Officer Faltz confirmed the video depicted the relevant location at the pertinent time. Therefore, there is sufficient evidence to establish the reliability of the video as authentic. Accordingly, the trial court had a sound basis to conclude that the State made a prima facie showing of authenticity. Any remaining questions concerning the completeness or accuracy of the evidence were properly left to the jury's assessment of its weight and credibility.

D.

Defendant argues his motion for judgment of acquittal should have been granted because "the three videos . . . and the screen-shots . . . should not have been admitted, and because there was no other evidence identifying [defendant] as the shooter." We disagree.

In evaluating his contention, we employ the standard established by the New Jersey Supreme Court in State v. Reyes, 50 N.J. 454, 458-59 (1967). A judgment of acquittal should be denied if "giving the State the benefit of all its

21

favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt."  Ibid.  A judgment of acquittal is proper only "if the evidence is insufficient to warrant a conviction."  R. 3:18-1.  A trial court considering a motion for a judgment of acquittal must "not [be] concerned with the worth, nature, or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State."  State v. Papasavvas, 170 N.J. 462, 521 (2002) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).  We review a trial judge's decision on a motion for a judgment of acquittal without deference and de novo.  State v. Lodzinski, 249 N.J. 116, 145 (2021); State v. Williams, 218 N.J. 576, 593-94 (2014).

Applying this standard, the surveillance video reveals an individual with a distinctive tattoo holding a firearm both outside the bodega and then bringing it back inside the bodega following the shooting.  Although the footage does not capture the shooting itself, it depicts the individual with the neck tattoo pointing a gun at the victim's face.  The two parties then move out of the camera's view, and when the victim reappears on screen, he is seen clutching his face.  Under Reyes, we must view the evidence, and any inferences drawn therefrom, in the light most favorable to the State.  50 N.J. at 458-59.  We are satisfied the State

met its burden to establish "a reasonable jury could find guilt of the charge beyond a reasonable doubt." Ibid. Accordingly, we discern no error in the trial court's decision to deny defendant's motion.

E.

Finally, we are not persuaded by defendant's argument the prosecutor made improper comments about the evidence to the jury in his summation. For the first time on appeal, defendant argues the prosecutor's two references to the victim providing a "statement" to Detective Brown and the use of the word "fled" were improper comments on the evidence made to insinuate defendant's guilt.

First, we note defendant did not object to these comments at trial. Therefore, we review them for plain error. Singh, 245 N.J. at 13.

Second, prosecutors "may not advance improper arguments." State v. Lazo, 209 N.J. 9, 29 (2012). "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." State v. Frost, 158 N.J. 76, 83 (1999) (quoting State v. Farrell, 61 N.J. 99, 105 (1972)). Nevertheless, "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are therefore "afforded considerable leeway in

23

closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Id. at 82. In other words, there is no error as long as the prosecutor "stays within the evidence and the legitimate inferences therefrom." State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)).

We discern no impropriety in the prosecutor's remarks, which constitute permissible argument based on legitimate inferences drawn from the evidence presented. The prosecutor's reference to Detective Brown's statements, without any additional substantive detail about them, was permissible. In addition to illustrating the standard investigatory procedures adopted by Detective Brown following the shooting, they were also provided in response to defendant's accusation that the police conducted a "sloppy" investigation. By making these assertions, defense counsel opened the door for the State to reiterate the nature and scope of the police investigation, including the fact that witnesses were interviewed. See Branch, 182 N.J. at 532 (holding that a defendant who "opens the door by flagrantly and falsely suggesting that a police officer acted arbitrarily" may permit the officer to dispel that false impression, even if some prejudice to the defendant may result).

Similarly, we are satisfied the prosecutor's use of the term "fled" did not impermissibly sway the jury. The jury was certainly free to consider the actions of defendant in light of the video and what might be considered to be a different interpretation of his actions. Therefore, we are not persuaded that the prosecutor's comments had "a clear capacity to bring about an unjust result." State v. Johnson, 31 N.J. 489, 510 (1960).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division